ARENSON et al., Plaintiffs,

v.

BOARD OF TRADE OF the CITY OF CHICAGO et al., Defendants.

SAVETT, Plaintiff,

v.

BOARD OF TRADE OF the CITY OF CHICAGO et al., Defendants.

FULLER et al., Plaintiffs,

v.

BOARD OF TRADE OF the CITY OF CHICAGO et al., Defendants.

WENGERT, Plaintiff,

v.

BOARD OF TRADE OF the CITY OF CHICAGO et al., Defendants.

ARENSON et al., Plaintiffs,

v.

CHICAGO MERCANTILE EXCHANGE et al., Defendants.

RYAN et al., Plaintiffs,

v.

REYNOLDS SECURITIES, INC., et al., Defendants.

RYAN et al., Plaintiffs,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., et al., Defendants.

RYAN et al., Plaintiffs,

v.

F. I. DuPONT et al., Defendants.

Nos. 71 C 855, 72 C 1633, 72 C 747, 72 C 750, 71 C 854, 72 Civ. 1341, 72 Civ. 1443, 72 C 1612.

United States District Court, N. D. Illinois.

Feb. 11, 1974.

Pressman & Hartunian, Specks & Goldberg, Ltd., Schein, Askounis, Stavins & Wald, Schlifkin & Berman, Lawrence Walner, Perlman, Rubin & Schulman, Chicago, Ill., and Harold E. Kohn, Philadelphia, Pa., Pomerantz, Levy, Haudek & Block, New York City, for plaintiffs.

William R. Jentes and Jeffrey J. Kennedy, Kirkland & Ellis, Lee A. Freeman, Freeman, Freeman & Salzman, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

BAUER, District Judge.

This cause comes on an application for the fixing of counsel fees and for reimbursement of out-of-pocket costs.

This application is submitted on behalf of all counsel for the class representatives in the above-captioned consolidated actions. The Settlement Agreement which this Court approved on June 4, 1973, after a full hearing and appropriate notice to the members of the class, specifically provided that applicants were to receive from defendant exchanges their counsel fees and reim-

bursement of out-of-pocket costs and expenses, all as determined by this Court.

The applicants contend that since the time for appeal from the order approving the settlement has expired and the order has become final, they are entitled to receive such counsel fees and reimbursement of costs and expenses. The applicants request that this Court fix their counsel fees and allow reimbursement of their out-of-pocket costs and expenses as follows:

Counsel Fees ......... $2,250,000.00
Out-of-Pocket Costs
and Expenses ........... $14,486.25

The applicants and defendants have submitted memoranda and affidavits in support of their respective positions. On December 7, 1973 a hearing was held on this matter and pursuant to this Court's request at that hearing the applicants have filed more detailed affidavits and memoranda in support of their application. This Court has seriously examined the memoranda and affidavits submitted by the parties in support of their respective positions and carefully weighed the testimony and arguments made at the hearing on December 7, 1973.

## ATTORNEYS' FEES

■ It is within the exercise of this Court's informed discretion to decide upon the amount of reasonable attorneys' fees and out-of-pocket expenses. Tranberg v. Tranberg, 456 F.2d 173 (3rd Cir. 1972); Cappel v. Adams, 434 F.2d 1278 (5th Cir. 1970).

■ Various objective "checklists" have been devised as guidelines for determining a fair award of attorneys' fees. See Hanover Shoe, Inc. v. United Shoe Machine Corporation, 245 F.Supp. 258 (M.D.Pa.1965), vacated on other grounds, 377 F.2d 776 (3rd Cir. 1967), affirmed in part on other grounds, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); Colson v. Hilton Hotels Corporation, 59 F.R.D. 324 (N.D.Ill.1972);

Trans World Airlines, Inc. v. Hughes et al., 312 F.Supp. 478 (S.D.N.Y.1970); In re Osofsky, 50 F.2d 925 (S.D.N.Y.1931). It is the opinion of this Court that the following factors are important to the proper determination of the amount of reasonable attorneys' fees:

I. The Magnitude and Complexity of the Litigation.

A. The number of parties to the action.

B. The complexity of the issues contained in the action.

C. The social effect of litigation.

D. Whether plaintiffs' or defendants' counsel had the benefit of a prior judgment or decree in a similar or identical case brought by the Government or a private party.

E. The significance of the litigation and the responsibilities undertaken.

II. The Quality of the Services Provided.

A. The eminence of the attorneys at the bar and in the specialty in which they are practicing.

B. The value of the attorneys' work in the instant case as demonstrated by skill involved in drafting the pleadings and memoranda, and the quality of the arguments before the bench and the performance in the courtroom.

III. Time and Labor Spent.

A. The time which has fairly and properly been used in dealing with the case.

IV. The Beneficial Result Achieved.

A. The amount in damages recovered, if any.

B. Whether the result of the case is a real benefit to the client and whether that result was possible without the instant litigation.

C. What it would be reasonable for counsel to charge a victorious plaintiff.

### I. The Magnitude and Complexity of the Instant Litigation

As far as the social effect of this litigation, it is clear that this litigation is one of the most significant pieces of litigation pending in the Northern District of Illinois, if not the United States.[1] An entire industry has been restructured, an industry which is now one of the most important in the world. Until the time of the approval of the settlement in this case, fixed commission rates were the norm in all exchanges in the United States.[2] This is no longer the case. Further, the applicants contend that it may be expected that no exchange in the United States, whether commodities or securities, will escape the effects of this settlement.

Given the number of litigants involved, the number and skill of their attorneys, and the complexity of the issues involved, it is clear that these actions represent a proceeding of the first magnitude. On the plaintiffs' side, the approximately 400,000 class members were represented at various points in these proceedings by more than twenty individual lawyers from eight separate law firms. On the defense side, there were innumerable individual lawyers and separate law firms representing the more than 2,000 members of the defendants' class.

It would be difficult to imagine litigation presenting issues of greater sublety and complexity. All issues were fought out at a legal frontier where no lawyer knew all the answers. The legal posture of all litigants made necessary analysis and arguments of extreme importance to the emerging case law with little guidance from prior court decisions.[3]

---

1. See the Order Approving Settlement and Other Matter of June 4, 1973 and the Transcript of the Hearing of June 4, 1973.

2. Both the Board of Trade and the Chicago Mercantile Exchange have the long-standing policy of fixing commission rates by agreement of the members of those boards. In the case of the Board of Trade of the City of Chicago, this practice has gone on unchallenged for over one hundred years. In the case of the Chicago Mercantile Exchange the practice of setting minimum rates of commission dates from its inception on February 5, 1898 when it was known as the Chicago Butter and Egg Board. The practice involved in this case predates the Sherman Act. The first attack upon this practice of rate-fixing came in 1926, in Chamber of Commerce of Minneapolis v. Federal Trade Commission, 13 F.2d 673 (8th Cir. 1926). That decision, which has not been challenged in the 45 years prior to the filing of this case, is somewhat bolstered by legislative and administrative interpretations.

The practice on the part of commodity exchanges of setting such rates was specifically approved in an exhaustive opinion by the Eighth Circuit in Chamber of Commerce of Minneapolis v. Federal Trade Commission, *supra*. Moreover, in 1921–22, and again in 1935–36, Congress extensively considered the operations of the nation's commodity exchanges in connection with the regulatory legislation which is now embodied in the Commodity Exchange Act (7 U.S.C. PPI et seq.; Chap. 369, PL, 42 Stat. 998; Chap. 545, PL, 49 Stat. 1491).

The legislative history makes it clear that Congress was well aware of the exchanges' practice of established minimum commission rates and that, arguably, Congress contemplated they would continue that practice. Consistent with that objective, the Secretary of Agriculture, to whom Congress entrusted the primary responsibility for administering the Act, has affirmatively required the exchanges' enforcement of their minimum commission rules.

Thus, it is clear that the instant litigation and settlement will have the most significant effect upon the history of fixed commission rates by commodity exchanges.

3. Some of the issues covered were:
1. Does the Sherman Act apply to all?
2. If it does, is this application limited in any way?
3. If the Sherman Act applies, does the rule of reason apply or is the fixing of commission rates a *per se* violation?
4. If the rule of reason applies, how should it be applied in this case in light of the complexity of the factual situation?
5. Does the Court have primary jurisdiction or does the primary jurisdiction reside in the Commodity Exchange Authority ("CEA")?
6. Assuming that primary jurisdiction resides in the CEA, is that jurisdiction merely advisory?
7. To what extent is the Court governed by a determination of the CEA?

This case is unique in that counsel for plaintiffs not only did not have the benefit of a prior government judgment or decree but there was no government litigation pending or even filed at the time this litigation was commenced. It was not until December 1971, some eight months following the filing of the first of these civil suits, that the anti-trust division became prepared to undertake this type of litigation. The applicants allege that it would be more appropriate to assert that in this case the federal government had the benefit of the plaintiffs' case and not the other way around.[4] Regardless of the rectitude of the applicants' contention, it appears certain that they were blazing new legal trails in instituting this litigation.

Plaintiffs undertook to assert the illegality of the long established business practice of fixing commission rates in commodities exchanges on behalf of a class consisting of approximately 400,000 members. The responsibility went beyond the mere representation of clients. At stake was the manner in which billions of dollars of business would continue to be done in the United States. As the parties gradually came closer to a settlement the responsibility of the plaintiffs' counsel for a just result increased. No longer was there to be a trial of issues to be interpreted solely by the Court. Instead, the attorneys representing the plaintiffs and defendants would make recommendations to this Court based upon an assessment of their respective legal positions, the welfare of their clients and the necessities of business practice. At the same time each side was aware that the decisions which they were making would affect the future operation of all exchanges.

An examination of the Master Settlement Agreement discloses the intricacy and subtlety of the decision-making process involved in the instant litigation.[5] Negotiation of the Master Settlement Agreement called forth the utmost in legal care, talent and learning. Had plaintiffs' counsel not assumed the responsibility of agreeing to the fundamental settlement embodied in the Master Settlement Agreement, it is quite possible that the plaintiffs' class would not have been certified, causing the death of this broad sweeping litigation and that the institutions and business

8. Should the Court award damages in the case of such a long-standing business practice? If so, how should damages be calculated?

9. Should the classes (both defendants and plaintiffs) be established? The question of manageability of such classes, particularly plaintiffs' class, is one of several class issues which continues to perplex the courts in their application of Rule 23 of the Federal Rules of Civil Procedure.

4. Faced with the undeniable fact that the *Arenson* cases were filed in 1970, eight months before any government suit, defendants fall back on the issuance of a Civil Investigative Demand ("CID") by the Anti-trust Division in 1969. While the CID may be a spark that inspired the litigants to bring this action it is of little value to private litigants. When the government did file its suit it named only one defendant, the Chicago Board of Trade. Arenson had already sued the Board of Trade, the other major exchange, the Chicago Mercantile Exchanges, and all the major brokerage houses. The *Savett,*

*Fuller* and *Ryan* cases brought in all of the commodity exchanges in the nation, successfully maintaining, by means of the settlement, both plaintiff and defendant classes. Even if the government had brought suit first, which it did not, it would have been far outdistanced.

5. An example of this is Paragraph 3 of the Master Settlement Agreement. There the question of how quickly to go to fully negotiated rates was intertwined with the question of whether or not smaller defendants could survive so fundamental a change in their way of doing business if it occurred suddenly, Moreover, if plaintiffs were to have forced a large number of defendants into an impossible position, what then would have happened to the possibility of an agreement. It was only by balancing out, in the more careful fashion, the interests of plaintiffs and defendants in rational debate with their adversaries that plaintiffs were finally able to accept responsibility for recommending Paragraph 3. This was the resultant compromise between the position of defendants (6 years) and the position of plaintiffs (3½ years).

practices which the complaint attacked would have remained unchanged.

## II. The Quality of Services Provided

This Court is hard pressed to find another case in its history which had such a glittering array of legal talent on the sides of both the plaintiffs and defendants. Certainly the attorneys for the plaintiffs as well as the attorneys for the defendants represent the cream of the Anti-trust bar in the United States. Plaintiffs' attorneys are well-known in the anti-trust and securities fields, and have litigated some of the most significant cases to come before the bench in the past decade. Plaintiffs' attorneys include counsel who tried the first of the electrical equipment anti-trust cases resulting in an award after a jury verdict of $29,000,000, Philadelphia Electric Co. v. Westinghouse Electric Corp. 1964 Trade Case, Para. 11, 123 (E.D.Pa. 1964); counsel who accomplished the $29,000,000 settlement in City of Philadelphia v. American Oil Co., Civ. No. 647–68 (D.N.J.1973); Philadelphia Electric Company v. Anaconda American Brass Co., 47 F.R.D. 557 (E.D.Pa.1969), and the $26,000,000 settlement in Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp., 341 F.Supp. 1077 (E.D.Pa.1972).

Full credit must be given to plaintiffs' counsel for the significant result achieved in this litigation. Their standing and prior record of success in major antitrust and class action litigation must have been one of the major factors in the defendants' decision to settle on an industry-wide basis.

Plaintiffs' attorneys, in their presentation of pleadings, memoranda, and the Master Settlement Agreement and in their performance in the courtroom during hearings and settlement negotiations have sincerely impressed this Court with their skill, expertise and dedication to service. The instant Master Settlement Agreement is not only documented testimony of the outstanding performance of plaintiffs' attorneys, but also a well deserved addition to their illustrious careers and their service to the anti-trust bar.

## III. Time and Labor Spent

In this litigation plaintiffs were faced with the problem of putting together a case without benefit of prior successful action by the government and in direct contravention of decisional law and business custom and practice of many years duration. After carefully examining the affidavits of the plaintiffs' attorneys in regard to time expended it is clear to this Court that the instant action necessitated many difficult hours of study and preparation before and after the filing of these suits.

After these suits were filed the question of primary jurisdiction was raised by the defendants; briefed and argued by both sides. Depositions were taken, experts consulted and studies made. Since under Rule 23 of the Federal Rules of Civil Procedure it is necessary to have a class determination early in the case plaintiffs apparently proceeded to prepare for that issue by submitting interrogatories and researching and briefing the question.

When finally there were indications that the case might be settled, lengthy, and complicated negotiations were entered into. These negotiations involved innumerable meetings both with representatives of the defense counsel and among the various plaintiffs' attorneys. Whatever differences between attorneys existed from time to time were always harmonized and at no time did plaintiffs' attorneys present anything but a united front. The settlement documents as finally approved went through a multitude of changes as the necessities of the plaintiffs' position and the negotiations required. The Master Settlement Agreement as finally approved by this Court represents the fruition of the labor of both plaintiffs' and defendants' attorneys.

This Court has considered the number of hours spent in this litigation by the plaintiffs' attorneys as well as the man-

ner in which they were spent. See Lindy Bros. Builders v. American Radiator and Standard Sanitary Corp., 487 F.2d 161 (3rd Cir. 1973). It is the opinion of this Court that the vast majority of the time spent by the plaintiffs' attorneys in this litigation was fairly allocated to discovery, legal research, preparation of pleadings, settlement negotiations and general case preparation.

Since the benefit of these actions accrued to all class members, there is no need or basis in the instant litigation to segregate the attorneys' time spent between that spent on behalf of the class members and that spent solely on behalf of the named plaintiffs. All members of the class have benefited as a whole by the services of their attorneys.

A small amount of time which is recorded in the affidavits of plaintiffs' attorneys cannot be allowed as reasonable time spent on this litigation. Thus it is the opinion of this Court after carefully examining the affidavits and supplemental affidavits of the plaintiffs' attorneys that 3,734.50 hours, were properly expended by the plaintiffs' attorneys in this litigation. The following is a breakdown of that total time by attorneys:

| | | |
|---|---|---|
| 1. | Aram A. Hartunian and Charles Pressman | 1542.25 hours [6] |
| 2. | William C. Engelke | 20.00 hours |
| 3. | Steven Goldman | 255.00 hours |
| 4. | Paul Lurie | 35.50 hours |
| 5. | Jack Joseph | 37.75 hours |
| 6. | Edward A. Berman and Lawrence Walner | 295.00 hours [7] |
| 7. | Jerome S. Wald | 126.75 hours |
| 8. | Perry Goldberg | 694.50 hours |
| 9. | Josef D. Cooper | 17.25 hours |
| 10. | Granvil I. Specks | 14.75 hours |
| 11. | Aaron M. Fine | 152.50 hours |
| 12. | Stuart H. Savett | 238.00 hours |
| 13. | Donald L. Weinberg | 93.75 hours |
| 14. | Arthur M. Kaplan | 50.50 hours |
| 15. | Herbert E. Milstein | 14.00 hours |
| 16. | Michael D. Hausfeld | 3.50 hours |
| 17. | Harold E. Kohn | 3.50 hours |
| 18. | Abraham L. Pomerantz | 60.00 hours |
| 19. | Richard M. Meyer | 35.00 hours |
| 20. | Donald J. Miller | 45.00 hours |
| | Total = | 3734.50 hours |

## IV. The Beneficial Result Achieved

### A. The Beneficial Result.

At the June 4, 1973 hearing on the settlement, counsel for the Chicago Mercantile Exchange stated: ". . . the plaintiffs feel proud of the settlement and I can say, on behalf of the defendants, we too think that it was a well-workmanlike job achieved, which serves to restructure an entire industry—restructuring it with the tempering device of a phase-out of what has been a practice for over 100 years".[8] According to the affidavit of Professor Rubin A. Kessel of the University of Chicago, the effect of the elimination of the fixed rate schedule (the instant settlement) will save the plaintiffs' class an amount which reduced to present value, totals at least an eight hundred million savings.[9] Professor Hieronymous of the Universi-

6. The sum of 155 hours which was classified as an estimate of miscellaneous additional time spent on the instant litigation was not included in this Court's allowance of time spent because there was no proper categorizing or recordation of such time.

7. The sum of 38½ hours which was unrecorded time spent on correspondence is not included in the total time allowed by this Court because there was not proper recordation of that time.

8. See Transcript of the June 4, 1973 hearing at p. 19.

9. Professor Kessel assumes that a reduction in negotiated commission rates for all non-member traders will occur after the settlement is initiated. He calculates this reduc-

tion at $77,000,000 per year after the phase-out period. Professor Kessel assigned a present worth to these prospective savings at over $800,000,000.00 computed by means of a "perpetual stream" of realized savings. He assumed that no other future circumstance would have achieved negotiated rates absent the settlement.

While admitting that the evidence of what would happen pursuant to the instant settlement is not abundant Professor Kessel concluded that the best evidence to determine what the level of competitive rates would be is the difference in commission rates for different customers and traders, e. g., non-members versus members, oats versus wheat, and spreads or day traders versus straight traders (Kessel Affidavit, pp. 1–7). Taking these

ty of Illinois has grave doubts that the elimination of minimum commissions will lower the general level of rates as predicted by Professor Kessel.[10] Professor Cootner of Stanford University has stated that Professor Kessel's estimates of the saving of the instant settlement is too conservative and probably the actual savings is closer to one billion dollars.[11] Regardless of whether the actual savings of the instant settlement is far less or far in excess of $800,000,000.00, it is clear to this Court that the beneficial results achieved by plaintiffs' attorneys in the instant settlement is one of the most significant results ever achieved in history by antitrust litigation.[12]

### B. Reasonable Attorneys' Fees for the Beneficial Result.

■■ It is not necessary to produce "a common fund" or a monetary recovery for fees to be awarded plaintiffs' attorneys. The foundation for the historic practice of granting reimbursement for costs of litigation other than the conventional taxable costs is part of the original authority of the chancellor to do equity in a particular situation. See Mills v. Electric Auto-Lite Company, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).[13] It must be remembered that the award of attorney's fees in certain cases is necessary to provide an incentive to counsel for the representation of a class.

The value of a lawyer's services is not merely measured by time or labor. The practice of law is an art in which success depends as much as in any other art on the application of imagination—and sometimes inspiration—to the subject matter. See Woodbury v. Andrews Jergens Co., 37 F.2d 749 (S.D.N.Y.1930); Sampsell v. Monell, 162 F.2d 4 (9th Cir. 1947).

---

differences as the measure of the competitive reduction in non-member commissions as his basic premise, Professor Kessel then evolves his long term "perpetual stream" savings.

There are some problems with Professor Kessel's specific computation. No mention is made of the necessity of an added mixture of rates to achieve both a liquid market and at the same time proper economic rewards for broker services. No attempt is made to determine whether the industry could continue to exist with the elimination of $77,000,000.00 in annual gross commissions as Professor Kessel envisions. No mention is made of the increased cost of servicing the small trader, nor is any effort made to determine the composition of the market place as between small and large traders, spreaders and speculators, or the volume of non-member trading in oats versus soybeans or cattle. Indeed, Professor Kessel's approach is more theoretical than a statement of absolute certainty.

10. See the Affidavit of Professor Hieronymous.

11. See the Transcript of the Hearing of December 7, 1973, at pp. 13–14.

12. Most experts agree that the elimination of fixed rates would:
(1) reduce the overall level of commission rates;
(2) result in a rate structure allowing discounts based on cost savings;
(3) permit the "unbundling" of rates so as to allow customers to select only those services they need or desire;

(4) promote efficiency and innovation in the commodity commission industry.
It is clear then that the settlement of the instant action will extremely benefit the plaintiff class but the extent of the benefit is difficult if not impossible to accurately assess.

13. The defendants contend that the time spent by counsel in seeking equitable relief should not be recognized. See Trans World Airline v. Hughes, *supra*; cf. International Telegraph and Telephone Corp. v. General Telephone and Electronic Corp., 1973 Trade Cases, para. 74,270 (D.Hawaii 1970). The *Hughes* case which the defendants rely on was not a class action and applied the prevailing rule that a statutory award of counsel fees under Section 4 of the Clayton Act, 15 U.S.C. § 15, does not extend to an award based on injuntive relief, but only to an award based on recovery of damages. This rule has nothing to do with a class action where the overriding factor is the benefit conferred. The important thing is to stop the evil conduct. For this an injunction is the appropriate remedy, and an attorney who obtains one should be properly compensated by the defendant. The plaintiffs have obtained an injunction to stop the evil conduct and there is a multi-million dollar benefit to the plaintiff class. In light of the beneficial result achieved and in light of the fact that the defendants agreed to pay the fees of plaintiffs' attorneys without any reference to Section 4, it is clear that the defendants' contention is without merit.

While opinion of the parties may differ as to what it would be reasonable to charge victorious plaintiffs who have been saved allegedly eight hundred million dollars, it should be agreed by all sides that such fees were they charged to a private litigant would bear a substantial relationship to the amount saved that litigant.[14] To that consideration should be added the fact that all of the works of plaintiffs' counsel was contingent.

Several courts have considered an appropriate fee based on an hourly rate which takes into account the contingency element involved in the litigation. An award of over $400 per hour was approved in the multi-district litigation involving plumbing fixtures. Philadelphia Housing, et al. v. American Radiator and Standard Sanitary Corporation, et al., No. 41773 (E.D.Pa.1973). Most recently in multi-district litigation involving the gasoline industry, fees of over $500 per hour were awarded. City of Philadelphia, et al. v. American Oil Company, et al., Civ. No. 647–68, et seq. (N. N.J.1973).[15] In all these instances, the

14. Courts have traditionally awarded attorneys' fees in relationship to the damages, settlement, or benefit achieved:

| Case | Court Awarded Fee As Percentage of Treble Damages or Settlement |
|---|---|
| Noerr Motor Freight v. Eastern Railroad Presidents Conference, 166 F.Supp. 163 (E.D.Pa.1958), affirmed, 273 F.2d 218 (3rd Cir. 1959), reversed on other grounds, 365 U.S. 127, 81 S.Ct. 523, 5 L. Ed.2d 464 (1961) | 31% |
| Darden v. Besser, 257 F.2d 285 (6th Cir. 1958) | 67% |
| Clapper v. Original Tractor Cab Co., 270 F.2d 616 (7th Cir. 1959), (cert. denied, 361 U.S. 967, 80 S.Ct. 588, 4 L.Ed.2d 547 (1960) | 30% |
| Bal Theatre Corp. v. Paramount Film Distributing Corp., 206 F. Supp. 708 (N.D.Cal.1962) | 13% |
| Twentieth Century Fox Film Corp. v. Goldwyn, 328 F.2d 190 (9th Cir. 1964), cert. denied, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed. 2d 87 (1964) | 33% |
| A. C. Becken v. Gemex Corp., 314 F.2d 839 (7th Cir. 1963), cert. denied, 375 U.S. 816, 84 S.Ct. 49, 11 L.Ed.2d 51 (1963) | 24% |
| Hanover Shoe Inc. v. United Shoe Machine Corp., 245 F.Supp. 258 (M.D.Pa.1965), vacated on other grounds, 377 U.S. 776 (3rd Cir. 1967), affirmed in part on other grounds, reversed in part on other grounds, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) | 14% |
| Trans World Airlines v. Hughes 312 F.Supp. 478 (S.D.N.Y.1970), modified on other grounds, 449 F. 2d 51 (2nd Cir.), reversed on other grounds, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) | 5% |
| Detroit v. Grinnel Corp., 356 F. Supp. 1380 (S.D.N.Y.1972) | 15% |
| Hartford Hospital et al. v. Charles Pfiger & Co., Inc., 1972 Trade Cases, Para. 74,112 (S.D. N.Y.1972) | 14% |
| The State of Illinois et al. v. Harper & Rowe Publishers, Inc., 55 F.R.D. 221 (N.D.Ill.1972) | 17% |
| Vandervelde et al. v. Put and Call Brokers and Dealers Association Incorporated et al., 344 F.Supp. 157 (S.D.N.Y.1972) | 50% |
| Perkins v. Standard Oil of California, 474 F.2d 549 (9th Cir. 1973) ; cert. denied, 412 U.S. 940, 93 S.Ct. 2778, 37 L.Ed.2d 400 | 13% |
| Woode Exploration & Producing Co. v. Alcoa, 1973 Trade Cases, Para. 74,668 (D.Tex.1973) | 20% |
| Pacific Coast Agricultural Export Association v. Sunkist Growers, 1973 Trade Cases, Para. 74,-523 (N.D.Cal.1973) | 27% |

15. Where the results achieved are favorable to the class courts have liberally awarded fees. Thus, for example, in Philadelphia Elec. Co. v. Anaconda, *supra*, finding the result achieved to be extremely favorable to the class, the court awarded attorneys' fees of 25% of the $22,175,000 recovery. See also Donson Stores, Inc. v. American Bakeries Co., 60 F.R.D. 417 (S.D.N.Y.1973) ; City of Philadelphia v. American Oil Co., *supra*.

fees approved were larger than the fee being awarded in the instant litigation and benefits achieved for the classes, though immense, were far smaller than the benefit which has been achieved here. Moreover, in no previous situation has the private anti-trust bar achieved a restructuring of the central pricing practices of a major industry. This achievement could well be of great instructive precedent in subsequent litigation.

■ It is the opinion of this Court after over two years experience with this litigation and after carefully examining and weighing the pleadings, Master Settlement Agreement, memoranda, affidavits and testimony of witnesses that the plaintiffs' attorneys should be awarded an aggregate sum of $1,339,060.00.

This Court has considered what a normal hourly rate would be for petitioning attorneys and there is no question that the fee which this Court deems appropriate in this case may appear excessive if one views this compensation solely in light of an hourly rate, even such an hourly rate as these skilled and experienced trial counsel command.[16]

Under the unique circumstances of this litigation and the significant result achieved it is clear to this Court that an award of four times the petitioning attorneys normal hourly rate is proper and just and will be the rate allowed by this Court. This is an average rate of $358.-56 per hour, which is less than the award of attorneys' fees in many anti-trust cases which have achieved less significant results than the instant litigation. See, e. g., American Radiator & Standard Sanitary Corporation et al., *supra*; City of Philadelphia et al. v. American Oil Company et al., *supra*. This represents an award of 1.74% of the alleged savings for one year after the four year phase out.[17]

When the fee is examined in light of the outstanding result obtained for the members of the class in this complex multi-district litigation which was keenly contested and wherein the counsel for the class were without the benefit of a prior judgment or verdict in a case brought by the government or the benefit of other counsel's work in a prior or companion case this Court is of the opinion that such fee is fair, reasonable and just. If these cases had been tried to verdict, there is no doubt that the number of hours of lawyer's time expended would be more than quadruple the number of hours expended to date. However, the possibility of trial producing a more favorable recovery for the class would be remote,[18] and the class

---

16. From the affidavits supplied by the plaintiffs' attorneys and this Court's experience with these attorneys in this and other litigation, it is the informed opinion of this Court that the hourly rate for these attorneys would in most instances be as follows:

| | |
|---|---|
| 1. Aram A. Hartunian and Charles Pressman | $100 per hour |
| 2. William C. Engelke | $60 per hour |
| 3. Steven Goldman | $75 per hour |
| 4. Paul Lurie | $80 per hour |
| 5. Jack Joseph | $70 per hour |
| 6. Edward A. Berman and Lawrence Walner | $75 per hour |
| 7. Jerome S. Wald | $75 per hour |
| 8. Perry Goldberg | $100 per hour |
| 9. Josef D. Cooper | $50 per hour |
| 10. Granvil I. Speks | $100 per hour |
| 11. Aaron M. Fine | $100 per hour |
| 12. Stuart H. Savett | $65 per hour |
| 13. Donald L. Wienberg | $35 per hour |
| 14. Arthur M. Kaplan | $40 per hour |
| 15. Herbert E. Milstein | $70 per hour |
| 16. Michael D. Hausfled | $50 per hour |
| 17. Harold E. Kohn | $125 per hour |
| 18. Abraham Pomerantz | $125 per hour |
| 19. Richard M. Meyer | $100 per hour |
| 20. Donald J. Miller | $60 per hour |

17. This is based on Professor Kessel's calculation of a saving of $77,000,000.00. This award is well within the average award of 20% of the damages or settlement. See Footnote 14. At the same time a larger attorneys fee is not justified given the speculative nature of the size of the savings and the interests of justice.

18. See the testimony of Professor Richard Posner at the hearing on December 7, 1973 (Transcript at pp. 42–46) that there was a substantial risk of failure in this litigation if it had proceeded.

would then have risked the many hazards of litigation such as trial error, appeals, verdict uncertainty, delayed results, etc. This Court's award of four times the hourly rate of the plaintiffs' attorneys is meant to adequately compensate them for initiating this significant litigation and negotiating such a beneficial settlement for the class; yet at the same time this award is not meant to provide a wind fall to the plaintiffs' attorneys.

The following is a breakdown by individual attorney of this Court's award of his fee:

| | Name of Attorney | Number of Hours Expended | Normal Hourly Rate | Awarded Hourly Rate | Fee |
|---|---|---|---|---|---|
| 1. | Aram A. Hartunian and Charles Pressman | 1542.25 | $100 | $400 | $616,900.00 |
| 2. | William C. Engelke | 20.00 | $ 60 | $240 | $ 4,800.00 |
| 3. | Steven Goldman | 255.00 | $ 75 | $300 | $ 76,500.00 |
| 4. | Paul Lurie | 35.50 | $ 80 | $320 | $ 11,360.00 |
| 5. | Jack Joseph | .37.75 | $ 70 | $280 | $ 10,570.00 |
| 6. | Edward A. Berman and Lawrence Walner | 295.00 | $ 75 | $300 | $ 88,500.00 |
| 7. | Jerome S. Wald | 126.75 | $ 75 | $300 | $ 38,025.00 |
| 8. | Perry Goldberg | 694.50 | $100 | $400 | $277,800.00 |
| 9. | Josef D. Cooper | 17.25 | $ 50 | $200 | $ 3,450.00 |
| 10. | Granvil I. Specks | 14.75 | $100 | $400 | $ 5,900.00 |
| 11. | Aaron M. Fine | 152.50 | $100 | $400 | $ 61,000.00 |
| 12. | Stuart H. Savett | 238.00 | $ 65 | $260 | $ 61,880.00 |
| 13. | Donald L. Weinberg | 93.75 | $ 35 | $140 | $ 13,125.00 |
| 14. | Arthur M. Kaplan | 50.50 | $ 40 | $160 | $ 8,080.00 |
| 15. | Herbert E. Milstein | 14.00 | $ 70 | $280 | $ 3,920.00 |
| 16. | Michael D. Hausfeld | 3.50 | $ 50 | $200 | $ 700.00 |
| 17. | Harold E. Kohn | 3.50 | $125 | $500 | $ 1,750.00 |
| 18. | Abraham L. Pomerantz | 60.00 | $125 | $500 | $ 30,000.00 |
| 19. | Richard M. Meyer | 35.00 | $100 | $400 | $ 14,000.00 |
| 20. | Donald J. Miller | 45.00 | $ 60 | $240 | $ 10,800.00 |
| | | | | Total = | $1,339,060.00 |

## OUT-OF-POCKET COSTS AND EXPENSES

■ The plaintiffs' attorneys in their petition have presented a detailed statement of their out-of-pocket costs and expenses which totals $14,486.25. It is the opinion of this Court that these out-of-pocket costs and expenses are proper and just.

Accordingly, it is hereby ordered that the plaintiffs' attorneys are awarded:

a) $1,339.060.00 in attorneys' fees as specified above, and

b) $14,486.25 in out-of-pocket costs and expenses.