**Hubert L. WILL, John R. Bartels, Henry Bramwell, Lloyd H. Burke, William J. Campbell, Fred J. Cassibry, Mark A. Constantino, Jack M. Gordon, George B. Harris, Irving Hill, Edward R. Neaher, Thomas Collier Platt, Jr., George C. Pratt, and Spencer Williams, on their own behalf and on behalf of all persons similarly situated, Plaintiffs,**

*v.*

**The UNITED STATES of America, Defendant.**

**Nos. 78 C 420, 79 C 4368 and 80 C 6692.**

United States District Court, N. D. Illinois, E. D.

May 14, 1981.

---

Kevin M. Forde and Richard J. Prendergast, Chicago, Ill., for plaintiffs.

Neil J. Koslowe, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER

ROSZKOWSKI, District Judge.

Before the Court is the report and recommendation of the fee committee as to an appropriate award of attorneys fees and costs incurred in connection with the representation of the class members in this case. For the reasons herein stated, this court adopts that report and awards the suggested fees and costs in accordance with this opinion.

■ These three related cases were brought and pursued on behalf of a class consisting of all persons who served as Judges of the United States pursuant to Article III of the Constitution of the United States: 1) prior to October 1, 1976 and continuing to March 1, 1977 and prior to July 11, 1977 and continuing to October 1, 1977 (No. 78 C 420) 478 F.Supp. 621 (N.D.Ill. 1979). ("Will I"); 2) prior to October 1, 1979 and who continued to hold that office after October 12, 1979 (No. 79 C 4368) ("Will II"); and, 3) prior to October 1, 1980 (No. 80 C 6692) ("Will III"). Some of the classes definitions were modified by subsequent orders.

The class which plaintiffs have represented consists of more than 800 persons serving in the United States Courts throughout the United States.

This Court granted summary judgment in favor of plaintiffs in 78 C 420 on August 29, 1979, *Will I*, 478 F.Supp. 621, and in 79 C 4368 on January 31, 1980, *Will II*.

On December 15, 1980, the Supreme Court affirmed in part and reversed in part both of these orders. *U. S. v. Will*, —— U.S. ——, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980).

On January 28, 1981, this Court granted plaintiffs' motion for judgment on the pleadings and for entry of judgment in 80 C 6692, *Will III*, it being clear from the Supreme Court's order that plaintiffs were entitled to judgment in this case.

On March 5, 1981, the fee committee filed their recommendations and suggestions and plaintiffs' counsel submitted their applications for an award of fees and expenses and costs.

Thereafter, in accordance with this Court's order, certain class members sub-

mitted comments and objections to plaintiffs' counsel fee requests.[1]

On April 1, 1981, this Court held a hearing on the petition for an award of attorneys fees now pending before this court. At that time, Judge Hubert L. Will, named plaintiff, spoke on behalf of the named plaintiffs, who submitted to this Court Recommendations and Suggestions as to Reasonable Award of Attorneys' Fees and the Method of Assessing Such Fees.[2]

As the Fee Committee has noted, despite the fact that there are various approaches adopted in the different Circuits for determining fees, a clear trend has emerged toward the use of a "time-rate" analysis and away from the use of a percentage of the

benefits analysis. See, Professor Arthur R. Miller's 1980 Report to the Federal Judicial Center, *Attorneys' Fees in Class Actions.*

Various sources discuss the applicable standards for determining reasonable attorney's fees.[3] The Code of Professional Responsibility as adopted by the American Bar Association provides:

Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particu-

---

1. This Court received letters either wholeheartedly approving, or recommending more than, the requested fees from twenty-five Judges: Honorable Sidney M. Aronovitz from the Southern District of Florida; Honorable Edward F. Boyle, Sr. from the Eastern District of Louisiana; Honorable John R. Brown from the Fifth Circuit Court of Appeals; Honorable Albert V. Bryan from the Fourth Circuit Court of Appeals; Albert V. Bryan, Jr. from the Eastern District of Virginia; Honorable John D. Butzner, Jr. from the Fourth Circuit Court of Appeals; Honorable Richard P. Conaboy from the Middle District of Pennsylvania; Honorable Ronald N. Davies from the District Court for North Dakota; Honorable James F. Gordon from the Western District of Kentucky; Honorable Robert W. Hemphill from the District Court for South Carolina; Honorable Thomas J. MacBride from the Eastern District of California; Honorable Frank J. McGarr from the Northern District of Illinois; Honorable James B. McMillan from the Western District of North Carolina; Honorable Robert R. Merhige, Jr. from the Eastern District of Virginia; Honorable Robert W. Porter from the Northern District of Texas; Honorable John A. Reed, Jr. from the Middle District of Florida; Honorable Charles R. Richey from the District of Columbia; Honorable Samuel M. Rosenstein from the United States Customs Court in Florida; Honorable William S. Sessions from the Western District of Texas; Honorable John V. Singleton from the Southern District of Texas; Honorable Eugene P. Spellman from the Southern District of Florida; Honorable Arthur J. Stanley, Jr. from the District of Kansas; Honorable D. W. Suttle from the Western District of Texas; Honorable Howard B. Turrentine from the Southern District of California; Honorable Bruce M. VanSickle from the District Court of North Dakota; and Honorable H. Emory Wid-

ener, Jr. from the Fourth Circuit Court of Appeals.

On the other hand, the following seven Judges filed objections to either the amount of fees or multiplier or the method of calculation: Honorable Thomas R. McMillen from the Northern District of Illinois, who objected to the method of assessing fees; Honorable Myron H. Bright from the Eighth Circuit Court of Appeals, with whom Honorable Theodore McMillian, also from the Eighth Circuit and Honorable Floyd R. Gibson from the Eighth Circuit and Honorable Gerald W. Heaney from the Eighth Circuit Court of Appeals, joined in objecting to the amount of fees requested; Honorable Gerard L. Goettel from the Southern District of New York objected to the multiplier requested and suggested a 50% increase instead; and Honorable Gilbert S. Merritt expressed concern over this Court's power to award fees where, as here, there was a partial reversal.

2. The Fee Committee was comprised of the following named plaintiff Judges: Honorable John R. Bartels, Honorable Henry Bramwell, Honorable Edward R. Neaher, Honorable Thomas Collier Platt, Jr. and Honorable George C. Pratt, all from the Eastern District of New York; Honorable Lloyd H. Burke, Honorable George B. Harris, and Honorable Spencer Williams, all from the Northern District of California; Honorable William J. Campbell and Honorable Hubert L. Will from the Northern District of Illinois; Honorable Fred J. Cassibry and Honorable Jack M. Gordon, both from the Eastern District of Louisiana; and Honorable Irving Hill from the Central District of California.

3. For a history of attorneys fee awards, see, *In re Folding Carton Antitrust Litigation,* 84 F.R.D. 245, at 255–263 (D.C.).

lar employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

Disciplinary Rule 2–106; See also, *Muscare v. Quinn*, 614 F.2d 577 (7th Cir. 1980); *In re Folding Carton Antitrust Litigation*, 84 F.R.D. 245, 256 (N.D.Ill.1979).

The Third Circuit decision in *Lindy Bros. Builders v. American Radiator*, 487 F.2d 161 (3d Cir. 1974) (*Lindy I*) is probably considered the landmark decision in the area of attorneys' fees awarded in class actions. *In re Folding Carton, supra*, 84 F.R.D. at 259. The significance of the *Lindy I* decision was its emphasis on the actual time and labor spent in litigating a class action as opposed to the more traditional, previously employed, emphasis on awarding fees on the basis of the size of the recovery. Additionally, the *Lindy I* court recognized two other factors of significance: 1) the contingent nature of the litigation, and 2) the quality of services rendered by counsel in prosecuting the action.

For purposes of evaluating the contingency nature of the action, a factor particularly relevant in the instant case, the court is to consider whether counsel had entered into any guaranteed fee agreements.[4] See also, DR 2–106(b)(8) of the Professional Code of Responsibility.

As to the quality factor, *Lindy I* utilized and assessed factors previously set forth in

DR 2–106(b)(1), (4), and (7) and in *In re Osofsky*, 50 F.2d 925, 927 (2nd Cir. 1931):

> In evaluating the quality of an attorney's work in a case, the district court should consider the complexity and novelty of the issues presented, the quality of the work the judge has been able to observe, and the amount of the recovery obtained. This last factor may be the only means by which the quality of an attorney's performance can be judged where a suit is settled before any significant in-court proceedings.

*Lindy I*, 487 F.2d at 168.

Later, in *Lindy Bros. Builders v. American Radiator*, 540 F.2d 102 (3d Cir. 1976) (*Lindy II*), the Third Circuit expanded upon the quality factor and the effect it should have on reaching a reasonable attorneys fee:

> In determining whether to adjust the "lodestar" for quality of work or not, the District Court may consider, *inter alia*, 1) the result obtained by verdict or settlement evaluated in terms of (a) the potential money damages available to the class members, i. e., a comparison of the extent of possible recovery with the amount of actual verdict or settlement; (b) the benefit—monetary or non-monetary—conferred on the class, i. e. permitting the court "to recognize and reward achievements of a particularly resourceful attorney who secures a substantial benefit for his clients with a minimum of time invested..."

> (2) An evaluation of the professional methods utilized in processing the case,— rewarding the use of efficient methods to expedite the case and penalizing the use of methods the predominant purpose of which was to delay or obstruct the proceedings.

*Lindy II*, 540 F.2d at 118. See generally, *Arenson v. Board of Trade*, 372 F.Supp. 1349, 1358–59 (N.D.Ill.1974); *In re Clark Oil*

---

4. Pursuant to Local Rule 39 of the Rules for the Northern District of Illinois, plaintiffs' counsel filed with this court a copy of the Contingency Fee Agreement in *Will I*, 78 C 420 and *Will II*, 79 C 4368. That Agreement reads in pertinent part that: "... the plaintiffs will be responsi-

ble for costs and expenses incurred in said actions and that counsel are retained on a contingent fee basis. If the action is successful, attorneys' fees will be determined by the Court in accordance with applicable principles of law."

*Anti-Trust Litigation*, 422 F.Supp. 503, 511 (E.D.Wisc.1977); *In re King Resources Securities Litigation*, 420 F.Supp. 610, 630 (D.Colo.1976).

While other courts have devised their own list of factors, it is apparent upon close analysis, that these factors are encompassed by both the Professional Code of Responsibility and the Third Circuit's *Lindy I and II* decisions with, perhaps, a difference in emphasis only. See, *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974); *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978).

There are a scarcity of decisions in the Seventh Circuit regarding the formula to be applied in determining awards of reasonable attorneys' fees. Nevertheless, a reading of the few cases available from this Circuit seems to disclose, generally, (1) an adherence to the *Lindy* time-rate analysis and the Code of Professional Responsibility considerations and (2) a rejection of the percentage-based fee. See, e. g. *Liebman v. J.W. Petersen Coal & Oil Co.*, 63 F.R.D. 684 (N.D.Ill.1974); *Arenson v. Board of Trade*, 372 F.Supp. 1349 (N.D.Ill.1974); *Waters v. Wisconsin Steel Works*, 502 F.2d 1309 (7th Cir. 1974); *Swanson v. American Consumer Industries, Inc.*, 517 F.2d 555 (7th Cir. 1975); and *Muscare v. Quinn*, 614 F.2d 577 (7th Cir. 1980).

More specifically, the district court in *Liebman*, 63 F.R.D. at 701, stated:

> After a determination of what would be a normal fee . . . adjustments should be made upwards or downwards to reflect special considerations such as contingency, complexity, amount of recovery of the class, inducement to counsel to serve as private attorneys general, duplication of services, public service considerations, etc.

And, in *Arenson*, 372 F.Supp. 1349, the court utilized four primary factors in reaching an award of attorneys fees: 1) magni-

tude and complexity of the litigation; 2) the quality of services provided; 3) time and labor spent; and, 4) the beneficial result obtained.

Most significant, in this court's opinion, is the exhaustive and thorough analysis for awarding attorneys' fees in class action anti-trust cases found in *In re Folding Carton Antitrust Litigation*, 84 F.R.D. 245, 263–270 (N.D.Ill.1979). In this opinion, an initial time-rate inquiry was found to be an appropriate starting point. Added to the time rate determination were four separate categories of factors: (1) the contingent nature of class litigation; (2) the quality of legal services in the litigation; (3) the benefits conferred upon the class; and (4) the public service aspect of this type of litigation. 84 F.R.D. at 265.

In these cases, counsel have devoted, on a totally contingent basis, more than 3,500 hours. Their services have produced more than nine million dollars ($9,000,000.00), and a salary increase for the Judiciary that exceeds ten million dollars ($10,000,000.00) per year.

In their initial application, counsel have requested a total of $850,000.00. Petitioner Kevin M. Forde has requested $450,000.00 for his services and $30,000.00 for services of associates. Petitioner Richard J. Prendergast has requested $370,000.00.[5] Additionally, petitioner Forde seeks reimbursement for costs and expenses advanced in the amount of $25,791.29, and petitioner Prendergast seeks costs and expenses in the amount of $3,968.24.[6]

## ANALYSIS

### BENEFITS TO THE CLASS

The cases have now been successfully concluded to the extent that, as a result of this litigation, all Article III Judges have received an effective increase in annual

---

**5.** The total $850,000.00 requested fee represents less than 10% of the recovery fund in the possession of the court, and less than 5% of the combined actual cash benefits received in damages and the aggregate additional salary in one year alone.

**6.** Originally, plaintiffs' counsel sought expenses and costs totalling $27,610.42. Thereafter, counsel submitted a supplemental schedule of expenses and costs, incurred since the original request, in the amount of $2,149.15 for a total of $29,759.57.

rates of compensation ranging from $12,-600.00 to $17,400.00 over prior "payable" rates.[7]

In addition to the increase in the future annual rate of compensation, there are direct cash benefits in the form of damages for recovered past compensation. The damage awards range from $10,983.00 (District Court) to $15,383.00 (Chief Justice) for Judges in service during the entire period in question.[8]

Judges in service for less than the full period at issue will be awarded damages based on their periods of service.

On March 31, 1981, a partial distribution to class members of $7,211,459.54 was au-thorized by this Court. This distribution amounted to an 85% payment of the class members total back pay award. District Judges in services during the entire period covered by these cases (October 1, 1976 through December 31, 1980) have damage claims of $10,983.38. Court of Appeals Judges in service during the entire period have claims of $11,766.71.

A final distribution will be made to all class members as soon as the parties have fully addressed, and this Court rules on, the issues regarding the withholding of annuity and insurance payments and the final result of any appeals.

But for the efforts of counsel, it appears that federal judges would currently have

7.

| Office | Payable Rates | Post Will III Rates | Increase |
|---|---|---|---|
| District Court and Court of International Trade Judges | $54,500 | $67,100 | $12,600 |
| Circuit Court, United States Court of Claims, and Court of Custom & Patent Appeals | 57,500 | 70,900 | 13,400 |
| Associate Justices of the Supreme Court | 72,000 | 88,700 | 16,700 |
| Chief Justice | 75,000 | 92,400 | 17,400 |

"Payable" rates refer to rates actually being paid judges prior to the Supreme Court's decision. In evaluating the benefits derived from this litigation it might be more accurate (as counsel suggested in their petition) to consider that the "payable" rates could have been increased by 5.5% for any Class member by merely executing the consent to waive his or her claim for the entire 12.9% increase at issue for fiscal 1980. On this basis, the salary increase was $9,600 (District Judge); $10,200 (Circuit Judge); $12,700 (Associate Justice) and $13,300 (Chief Justice). Of course, had judges accepted the 5.5% increase, all future adjustments, including the 9.11% effective October 1, 1980, might have been computed on the lower base. However, in this Court's opinion, the overall benefits are so substantial that the difference is not critical.

8.

| | Will I Oct. 1, 1976– Mar. 1, 1977 | Will II Oct. 1, 1979– Dec. 31, 1980 | Will II Oct. 1, 1980– Dec. 31, 1980 | Total |
|---|---|---|---|---|
| District Judge | $ 833.30 | $ 8,750.10 | $1,399.98 | $10,983.38 |
| Circuit Judge | 916.70 | 9,375.00 | 1,475.01 | 11,766.71 |
| Associate Justice | 1,250.00 | 11,625.00 | 1,849.98 | 14,724.98 |
| Chief Justice | 1,333.35 | 12,124.95 | 1,925.01 | 15,383.31 |

As explained in the preceding footnote, counsel note in their petition that, of the 12.9% increase reflected in the Will II figures, 5.5% was not disputed (so long as a Class member was willing to waive his or her claim for the balance). Counsel further suggested that per-haps this portion of the recovery should not be considered in measuring the benefits produced by this litigation. As noted above (Note 7), we have carefully considered this question in determining the appropriate fees to be paid counsel.

received no increase in compensation. As previously noted, in one year alone, the increases in compensation will total more than ten million dollars ($10,000,000.00). The total damage awards should exceed nine million dollars ($9,000,000.00). Through counsel's efforts, a "lump sum" payment of "tentative" damages has been deposited with the Clerk of the District Court and invested while final calculations were being made and other issues resolved. Through this process at least $290,000.00 in additional interest will be earned by the fund.

While it presently appears unlikely that there will soon be substantial salary increases for the Judiciary under the Salary Act, another beneficial result to the class will be the substantially higher cost-of-living adjustment under the adjustment act, 28 U.S.C. § 461, due to the higher base produced by these actions.

Also, because a substantial portion ($500,000.00 or more of the $850,000.00) of the fees to be paid counsel will come from the interest earned while the fund was on deposit, every class member will receive more than ninety-five percent (95%) of all unpaid prior compensation.

## COMPLEXITY OF THE LITIGATION

The questions involved in these three cases were not only novel, but also complex. Additionally, counsel was required, on an expedited basis, to prepare and present the issues before the United States Supreme Court. The plaintiffs-judges sought, and in part received, a determination that Acts of Congress were unconstitutional as violative of Article III of the U.S. Constitution. Five separate legislative enactments were challenged on both statutory and constitutional grounds. Even the Supreme Court recognized that the statutory network was a "complex web." Their summary of the scheme clearly makes this point.

> Congress has enacted an interlocking network of statutes to fix the compensation of high-level officials in the Executive, Legislative, and Judicial Branches, including federal judges. It provides for

quadrennial review of overall salary levels and annual cost-of-living adjustments determined in the same fashion as those for federal employees generally. In four consecutive fiscal years, Congress, with respect to these high-level Executive Branch, legislative, and judicial salaries, enacted statutes to stop or to reduce previously authorized cost-of-living increases initially intended to be automatically operative under that statutory scheme, once the Executive had determined the amount. In two of these years, the legislation was signed by the President and became law before the start of the fiscal year; in the other two years, on or after the first day of the fiscal year.

The salaries of high-level Executive, Legislative, and Judicial officials are set under the Postal Revenue and Federal Salary Act of 1967, 2 U.S.C. §§ 351–361. The Salary Act provides for a quadrennial review, starting in 1969, of these officials' compensation. A Commission on Executive, Legislative, and Judicial Salaries periodically examines the salary levels for these positions in relation to one another and to the General Schedule (GS), the matrix of grades and steps that determines the salaries of most federal employees. Its recommendations are submitted to the President, who in turn submits that report with his recommendations to Congress in the next budget. Each House of Congress must vote on the President's proposal within 60 days. If both Houses approve, the adjustment takes effect at the start of the first pay period beginning 30 days thereafter.

In 1975, Congress adopted the Executive Salary Cost-of-Living Adjustment Act, Pub.L. 94–82, 89 Stat. 419. The Adjustment Act subjects the salaries covered by the Salary Act to the same annual adjustment made in the General Schedule under the Federal Pay Comparability Act of 1970, 5 U.S.C. §§ 5305–5306. The Comparability Act requires that each year the President designate an agent to compare federal salaries to date on private-section salaries compiled by the Bureau of Labor

Statistics. The agent must undertake certain steps in his investigation and, ultimately, submit a report to the President recommending adjustments deemed appropriate to bring federal employees' salaries in line with prevailing rates in the private sector. A separate Advisory Committee on Federal Pay then reviews that report and makes its own independent recommendation. Thereafter, the President issues an order adjusting the salaries of federal employees and submits a report to Congress listing the overall percentage of the adjustment and including the reports and recommendations submitted to him on the subject. If the President believes that economic conditions or conditions of national emergency make the planned adjustment inappropriate, he may submit to Congress before September 1 an alternate plan for adjusting federal employees' salaries. This alternate plan controls unless within 30 days of continuous legislative session either House of Congress adopts a resolution disapproving of the President's proposed plan. If one House disapproves, the agent's recommendation governs. The increases take effect with the start of the first pay period following the beginning of the federal fiscal year on October 1.

—— U.S. at ——, 101 S.Ct. at 474–475.

## QUALITY OF COUNSEL

This Court can represent, without hesitation, that petitioners Forde and Prendergast pursued these cases in an unexcelled manner. The reputations, experience, and skill of the petitioners are superior. For example, Mr. Forde has, among other things, served as a law clerk in the federal courts; has taught law; has been appointed as Special Assistant Attorney General of the State of Illinois; and will commence service as President of the Chicago Bar Association in June of 1981. Mr. Prendergast has also served as a law clerk in the federal courts; has been in private practice for several years devoting his efforts primarily to the litigation of complex cases; and, along with Mr. Forde, has served as

co-counsel with former Supreme Court Justice Arthur J. Goldberg in the *Atkins v. U. S.,* 556 F.2d 1028 (Ct.Cl.1977) *cert. denied,* 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978), case, a forerunner to the instant lawsuits.

The comments submitted by the various judges who wrote to this Court, including those judges who registered objections, are illustrative of counsel's efforts in these cases. Judge Aronovitz stated:

I am grateful for the time and effort . . . devoted to this matter and I personally approve the very excellent manner in which a delicate subject . . . has been addressed by . . . counsel. . . .

Judge Robert W. Hemphill stated:

I think the fee, or fees, are more than reasonable, and I am one of those who welcome the opportunity to express my gratitude to our able counsel for the manner in which the case was presented. I subscribe to the opinion that plaintiffs discharging their duties as citizens and members of the judiciary, in light of *O'Donoghue v. United States,* 289 U.S. 516, at pages 533–34, 53 S.Ct. 740, at page 744, 77 L.Ed. 1356, were activated by considerations of public duty, and brought the suits in keeping with their responsibilities. Besides from other evidences of skill and application applied in the processing of the case by plaintiffs' counsel, the fact that they won the case attests to the professional expertise they employed, and for which they should be paid.

## THE TIME DEVOTED

These cases required a major, and, at times, a full-time commitment of counsel's time and resources often precluding other employment.

Additionally, there was an emergency nature to the briefing schedules and presentation of several of these cases. As previously indicated, when Congress passed the October 12, 1979 limitation, counsel and plaintiffs immediately recognized a genuine emergency in that there was a risk that

waivers would be filed by some judges or checks would be prepared which included the 5.5% adjustment, acceptance of which might have constituted a waiver. Had these checks been accepted, the Class would have been confronted with the contention that it had waived any right to the 12.9% adjustment. Significantly, in its opinion, the Supreme Court noted that *no* Class member had accepted the 5.5% adjustment. The complaint in *Will II* was filed just seven days after the adoption of the October 12, 1979 limitation. Within a few days thereafter, with the approval of the Court, a notice was mailed to the entire Class cautioning against acceptance of the 5.5% adjustment with the advice that the actions of Congress were being challenged.

Also, the *Foley v. Carter,* No. 79–3063 (D.D.C.1979) case was prosecuted on a near emergency basis at the same time that counsel were preparing briefs in support of their motion to affirm in the Supreme Court in *Will I* and their motion for summary judgment in the District Court in *Will II.*

Both petitioners here have submitted detailed time sheets in support of the number of hours claimed. A careful review of those time sheets establish, in this Court's opinion, the extreme reasonableness of the number of hours claimed by petitioners Forde and Prendergast, particularly in light of the fact that the first of these related cases has been before the district court since 1978 and successive additional suits have been filed for each year.

From time to time during the pendency of this lawsuit, it was necessary for plaintiffs' counsel to communicate with the 800 or so Class members and to answer numerous and complex questions from the individual Class members. Plaintiffs' counsel at all times discharged their responsibilities quickly, efficiently, and pleasantly, and they are to be commended for their highly professional conduct in this case.

In concluding that the total hours claimed here is reasonable, this Court notes that the hours claimed here are less than or equal to the total number of hours in other class action litigation which has been before this Court.

Likewise, we find the hourly rates to be utterly reasonable.

The Committee's recommendations were made after they looked to awards in other major cases, particularly in the Northern District of Illinois. In *In re Folding Carton Antitrust Litigation, supra,* a committee of attorneys was appointed by the Court [Judges Will and Robson] to make recommendations to the Court as to appropriate compensation. The committee determined that in 1979 a fair and reasonable rate for lead counsel in that case was $150 per hour. The committee noted that there were circumstances where counsel charged more than $150 per hour but recommended $150 in that case because of the "public service" aspect of the litigation. Middle partners in that case who made a significant contribution to the litigation were paid at a *base rate* of $125 per hour. The maximum hourly rate for associates was $75 per hour. In *Arenson v. Board of Trade of The City of Chicago,* 372 F.Supp. 1349 (N.D.Ill.1974, Bauer, J.) base rates of $125 per hour were approved in 1974. As the Court is aware, attorneys' rates have increased drastically since 1974. In *In re Cenco Securities Litigation,* MDL 291 (N.D.Ill.1980) Judge Crowley approved base rates of up to $165 per hour.

In the same case Judge Crowley approved base rates of $150 per hour in 1979. In *Trans Ocean Tender Offer Securities Litigation,* MDL 223 (N.D.Ill.1979, Will, J.) rates of up to $150 per hour for lead counsel were approved. As noted, these were all *base* rates, prior to the application of a "multiplier" which substantially increased the base rates in view of the other relevant factors. For example, in *In re Folding Carton Antitrust Litigation* some rates were more than doubled. In *In re Cenco* some were tripled for certain efforts, and in *Arenson* some were quadrupled.

In the instant case, petitioners seek a total fee award of $850,000.00 for over 3,500 hours of work. This would represent an average fee of $121.00 per hour as adjusted by a multiplier of 2. Clearly, based upon

other litigation in this district, such an hourly rate is reasonable here. Moreover, this Court finds a multiplier of 2 to be more than justified.

Both petitioners here contend that they are entitled to a multiplier. As petitioners correctly note, multipliers between 1.25 and 4 have been awarded in similar cases. See, e. g., *In re Folding Carton*, 84 F.R.D. 245, 267 (1.42 figure).

■ In determining whether to increase the "lodestar" fee, the court considers: 1) the contingent nature of the class action litigation; 2) the quality of legal services; 3) the benefits conferred upon the class; and 4) the public service aspect. See, *In re Folding Carton*, and *Lindy II*, 540 F.2d at 117.

The most significant factors for determining whether a multiplier is warranted concern the risks involved in the particular litigation, since the quality of legal service, which was excellent in the instant case, is considered in establishing the lodestar award.

As to the "risks" involved, the following considerations are applied:

1) Analysis of plaintiff's burden. Subsumed in this category are the following considerations: (a) the complexity of the case,—legally and factually; (b) the probability of defendant's liability,—whether it is clear or dubious; whether it has been previously suggested by other civil or criminal proceedings; whether it is asserted under existing case law or statutory interpretation, or is advanced as a novel theory; (c) an evaluation of damages,—whether the claims would be difficult or easy to prove.

2) Risks assumed in developing the case. This category subsumes consideration of: (a) the number of hours of labor risked without guarantee of remuneration; (b) the amount of out-of-pocket expenses advanced for processing motions, taking depositions, etc.; (c) the development of prior expertise in the particular type of litigation; recognizing that counsel sometimes develop, without compensation, special legal skills which may assist the court in efficient conduct of the litigation, or which may aid the court in articulating legal precepts and implementing sound public policy.

3) The delay in receipt of payment for services rendered.

If, having considered the foregoing or other relevant criteria, the district court desires to increase the "lodestar" award, it should identify those factors supporting its conclusion, state the specific amount by which the basic fee should be increased due to the contingency of success, and give a brief statement of reasons therefor. We reiterate that any such increment in the "lodestar" award is to be considered and applied apart from the evaluation of the quality of services rendered in the particular proceedings.

*Lindy II*, 540 F.2d at 117.

In deciding that petitioners here are entitled to a multiplier of 2, this Court notes that the risk factor assumed by counsel in pursuing this action on a contingency basis was substantial. Moreover, the questions involved in this case were novel and terrifically complex. The public aspect of this litigation is clear.

## METHOD OF ASSESSING FEE AWARD

This Court adopts the Fee Committee's suggestion for the method of awarding fees.

As the Committee noted, two alternatives for assessing the award appear available. First a "per capita" assessment "per judge" could be imposed. This method would take into account the possible substantial future benefits derived from the cases. For example, a judge only recently appointed may not have a substantial claim for past damages, but depending on future action of the President and Congress, may benefit more from these cases than a judge in service during the entire period covered by the litigation. This method, however, might present substantial difficulties in determining the fair "per capita" assessment per judge and collection problems from recently ap-

pointed judges whose "assessments" might exceed their claims for past damages.

The other alternative is a percentage assessment based on the amount of damages paid to each judge. It is the recommendation of the named plaintiffs that the award to counsel be paid first from the interest earned on the funds in the possession of the Clerk. After those funds are exhausted, payment should come from the interest earned ($202,-355.62) on the judgments pending appeal.

The Committee recommends that any further fees be paid from the funds before disbursement and that every Class members' claim be therefore proportionately reduced. This Court approves of that recommendation.

Accordingly, it is hereby ordered that petitioners are to receive the $850,000.00 in requested fees and the $29,759.57 for expenses incurred and fees are to be paid in accordance with the Committee's recommendation.