**In re WARRIOR DRILLING & ENGINEERING CO., INC., Debtor.**

**Bankruptcy No. BK 80–01988.**

United States Bankruptcy Court, N. D. Alabama, S. D.

March 18, 1981.

842

Robert B. Rubin, Sirote, Permutt, Friend, Friedman, Held & Apolinsky, Birmingham, Ala., for reorganized debtor and Howell Petroleum.

A. Berkowitz and Arnold K. Lefkovits, Berkowitz, Lefkovits & Patrick, Wilbur G. Silberman, Silberman, Silberman & Loeb, Birmingham, Ala., for Warrior Drilling, debtor-in-possession.

Van Oliver, Thompson & Knight, Dallas, Tex., for Creditors' Committee.

## MEMORANDUM OF OPINION

STEPHEN B. COLEMAN, Bankruptcy Judge.

This Chapter 11 proceeding is before this Court on the joint Application of the firms of Berkowitz, Lefkovits & Patrick and Silberman, Silberman & Loeb for final compensation for legal services rendered and reimbursement of expenses incurred in representing Warrior Drilling and Engineering Co., Inc. ("Warrior") as debtor-in-possession. In support of the Application the Applicants filed detailed time records, and oral testimony of themselves, James C. Barton, senior partner of the firm of Johnston, Barton, Proctor, Swedlaw & Naff of Birmingham, Alabama, and Morris Macey, an experienced bankruptcy practitioner in Atlanta, Georgia.

The Application is contested by the Howell Petroleum Corporation ("Howell"), the recent purchaser of the controlling stock of the Debtor. Howell has presented as witnesses in opposition the testimony of Arthur L. Moller, a former bankruptcy judge and bankruptcy practitioner in Houston, Texas and Darby Sere, now President of Warrior and an officer of Howell.

Applicants have requested total compensation of $440,000 for their services and reimbursement of expenses totaling $12,485.07.

In terms of assets and liabilities, this case involves the largest bankruptcy proceeding filed in this District and the first debtor in the business of the development, production, transportation and sale of oil and gas, seeking reorganization in bankruptcy in this District.

At the time of its filing in Chapter 11 in April 1980, Warrior was in default on a loan

from The First National Bank of Birmingham (the "Bank") in the amount of approximately $32,000,000, which debt was secured by virtually all of the assets of Warrior. There were other secured debts totaling several million dollars. Together with unsecured debts, including trade accounts and "take-or-pay" obligations, Warrior's debts totaled approximately $55,000,000. Estimates of the value of the assets of Warrior during these proceedings ranged from a liquidation value of less than the $32,000,000 owing the Bank to a "going concern" value in excess of all liabilities.

The Bank debt carried interest at a floating rate above prime and at the time of filing interest had reached the rate of 22% per year, or in excess of $550,000.00 per month. Certain bonds to foreign interests required payment in the nature of interest based on production which carried a potential rate of as much as 100% annually. In addition to these obligations, Warrior was obligated to provide or transport gas for its two largest customers, Alabama Gas Corporation and Southern Natural Gas Company. It was required to make periodic lease royalty payments or risk losing its interest in reserves and producing wells.

The Bank had demanded full payment and was threatening to foreclose; the foreign interests were making similar threats; and Warrior was experiencing operating losses exceeding $500,000 per month.

Warrior had lost key employees, and other crucial employees during the proceedings. Because of its manpower shortage, Warrior's obligations to make assignments to investors of interests in producing wells were long overdue.

Prior to its filing in Chapter 11, Warrior had executed a letter agreement, subject to subsequent approval of the requisite vote of stockholders of Warrior, under which it was contemplated that the Holly Corporation ("Holly") of Texas would be granted an option to purchase certain operating assets of Warrior. In addition, certain of Warrior's stockholders had granted to Holly options to purchase their stock and interim voting rights. Under the terms of such options, Warrior could not, as a practical matter, negotiate with other purchasers or devise other reorganization plans until after August 31, 1980, which would have been more than 120 days after its filing. These outstanding options provided no assurance to Warrior's or its creditors of payment in full of unsecured liabilities or any payment to Warrior's stockholders. The Holly proposal would have left Warrior with the obligation to liquidate its remaining inventory and to collect its own accounts receivable, with a very doubtful and uncertain result to unsecured creditors and equity security holders.[1]

The firm of Berkowitz, Lefkovits & Patrick, known to this Court for its experience and ability in bankruptcy and business law,[2] was retained by Warrior after a decision was made to file a Chapter 11 petition. Shortly thereafter, the firm of Silberman, Silberman & Loeb was associated to provide additional skill and expertise in the bankruptcy field.[3] Under the reorganization Warrior has paid all secured and unsecured debts which have been allowed, and its stockholders have already received a substantial return—in some cases more than 17 times their original investment. This extraordinary result was a product of (1) the purchase of stock and injection of new capital into Warrior by Howell and (2) the successful efforts of the Applicants to maintain Warrior as a going concern; to resist the efforts of the Bank and others to appoint a trustee, allow foreclosure or convert to Chapter 7; and to commit Howell to

1. The validity of the "Holly option" is the subject of a separate claim by Holly against Warrior and the Court is not now expressing any opinion with respect thereto.

2. The witness Macey testified that the firm bears a national reputation in the securities field.

3. Wilbur Silberman is a past president of the Commercial Law League of America, has testified before Congress on the new Bankruptcy Code, and has wide knowledge in the bankruptcy field.

funding an acceptable plan of reorganization.

As reflected in the Applicants' time records and as observed by this Court, Applicants were called upon immediately and unceasingly to render daily services to the Debtor upon substantially a daily basis; to respond to adversary proceedings set on an expedited basis; to negotiate with potential purchasers; to cooperate with a very sophisticated creditors' committee and its counsel; to communicate and negotiate with creditors and customers; and generally to deal with daily emergencies and internal crises. During extended periods Abe Berkowitz and Wilbur Silberman, senior partners of their respective firms, were required to devote practically their full time to this case. This necessarily delayed attention to other clients and responsibilities, and precluded their taking on new matters. Other members of the firms also devoted substantial portions of their time to these proceedings. Frequent travel was required.

Little of the work performed and services rendered by Applicants was of a routine nature. The problems facing Applicants on a daily and weekly basis were unique, particularly for this geographical area; required knowledge of business, oil and gas, and bankruptcy law; and involved untested provisions of the new Bankruptcy Code. The solutions to these problems required innovation, tireless effort, and skill in negotiation and advocacy.

Through court proceedings in this case, the frequency and length of which are apparent from the court record, this Court became familiar with the problems faced by Warrior, including its internal disputes, and pressures from creditors, customers and potential purchasers. Due to the financial condition of Warrior it was clear to this Court and Applicants from the outset that there was no realistic prospect of its reorganization absent a source of new capital.

As the case proceeded, the Court became increasingly concerned as to Warrior's prospects for finding such a source. Continuous attempts by the Bank and other creditors to have a trustee appointed, the automatic stay lifted in order to allow foreclosure, and the case converted to Chapter 7, required Applicants and key employees to devote substantial time to court proceedings. Because of some internal disagreements among the directors as to certain matters and the Company's deteriorating financial condition, the Court was at times inclined to appoint a trustee or examiner, which Applicants resisted. It is now clear that a trustee or examiner would have involved costs to the estate, apart from the delay, of perhaps as much as $500,000 in fees and expenses, the costs of which have now been avoided.

A summary of the proceedings and the services rendered by Applicants is set forth below.

I.

## SUMMARY OF PROCEEDINGS AND SERVICES RENDERED

Within a few days of the filing of the petition the Bank filed its first application for the lifting of the automatic stay, appointment of a trustee, conversion to Chapter 7 and for other relief. Other interests joined in, by formal pleading or argument in open court. The original application by the Bank was denied, and appeal was then taken by the Bank to the District Court.

A renewed application was filed by the Bank. Frequent hearings before the Court, begun almost immediately after the filing of the petition, were attended by leading members of the bars of Birmingham, Mobile, and Tuscaloosa, Alabama, Jackson, Mississippi, Houston and Dallas, Texas and other cities.

The Court immediately recognized the difficulties facing the Company and, at the very outset observed that it was absolutely necessary that the Company continue its operations and be reorganized as quickly as possible, for the benefit of its creditors, producers, limited partners, stockholders, and various other interests involved, such as the utilities Alabama Gas Corporation and Southern Natural Gas Company, holders of leasehold interests, royalty interests.

At the same time, counsel for the Creditors' Committee protested to the Court that the Court and Applicants, as counsel for the Debtor, were hurrying the case and pushing too hard, stating that it was their own experience that a case of this nature often required several years before reorganization could be successfully accomplished. In this case effective reorganization was accomplished in less than a year.

The frequent insistence by the Bank and others of the imperative necessity for the appointment of a trustee was strenuously opposed by counsel for the Debtor.

At the insistence of the Bank, the Court reduced the statutory period of the Debtor's exclusive right to file a Plan from 120 days to 80 days, or not later than July 9, 1980. The Debtor was unable to file its own plan by that date because the outstanding stock options in favor of Holly would not expire until August 31st. On July 10, 1980 the Bank filed its plan, which incorporated the original Holly proposal.

Between April 14 and September 5, 1980 more than 30 substantive adversary petitions had been filed.

Counsel for the Debtor strenuously resisted all these efforts to liquidate the corporation and plunge it into ordinary bankruptcy and were uniformly successful in their efforts.

Numerous proposals were submitted by other companies interested in purchasing the "operating assets" of the Debtor. All such proposals would have also left the Debtor with the necessity of liquidating its remaining assets, mainly consisting of real estate and accounts receivable, with an uncertain result to all interested parties except the Bank.

The Bank went so far as to contend that no administration costs could be paid until its own claim, including interest and expenses in excess of $400,000, had first been paid in full. This issue presented a question of national importance. Had it been successful, as noted by the Court in a prior opinion denying this contention, it would have raised grave implications adverse to the effective administration of practically all Chapter 11 cases throughout the nation.

To provide the Debtor with the opportunity to file some plan, counsel for the Debtor enlisted the aid of Hugo Marx & Company, a reputable bond firm, which formulated a plan under which a governmental entity would be created to purchase the corporation's assets by the sale of bonds. Through efforts of Applicants, Marx & Company agreed not to charge any fee for their valuable services.

On August 26, 1980, at a board meeting of the Debtor, Howell made an offer to purchase the shares of Warrior's stockholders, its first proposal being to pay $3.58 per share, less certain undisclosed liabilities. Counsel for the Debtor advised the Board of Directors and those directors who were stockholders of the possible adverse consequences of such an offer because of the provision for offsetting undisclosed liabilities against the purchase price of the stock. Howell then amended its offer to assure the payment of $1.78 per share unconditionally, which has now been paid. There is some question as to whether any additional amount will be paid to the stockholders; and had not counsel for the Debtor obtained the agreement of Howell to pay $1.78 per share, it is possible, dependent upon later completion of the report on undisclosed liabilities, that the stockholders may not have been entitled to any payment under the original Howell offer.

The original Howell offer included an obligation on the part of Warrior to submit a Plan of Reorganization containing many conditions which, without Howell's assistance, were insuperable. The offer further required the grant of a Management Agreement to Howell. Counsel for the Debtor raised serious objections to the Management Agreement in its original form. It was amended at a hearing before this Court, and then approved. Counsel for the Debtor insisted that the Plan of Reorganization filed September 5, 1980, should include an obligation of Howell to fund the Plan. Howell was then unwilling to do so.

On October 1, 1980, Howell announced its purchase of the Bank note for the face amount of the principal thereof. This purchase indicated a continuing interest on Howell's part to enable Warrior to file a Plan, but did not assure it. On the contrary, all that had happened was that Howell, instead of the Bank, became Warrior's largest secured creditor.

Counsel for Howell and the Debtor reviewed a draft of a Disclosure Statement originally prepared by Howell. The testimony indicates that an entire day was spent in revisions of this draft which, in its original terms, were not acceptable to counsel for the Debtor.

Numerous objections were made to the Disclosure Statement formally and in open court by parties in interest. On September 7 the Court was persuaded to approve the Disclosure Statement and issue an opinion in conjunction therewith.

Confirmation of the Plan was set for hearing November 24, 1980. Numerous objections were made to the confirmation of the Plan because it did not legally bind Howell to its consummation.

On November 19, 1980 counsel for the Debtor insisted upon a conference with counsel for Howell and the Court. At that conference, counsel for the Debtor stated that, unless Howell firmly bound itself to fund the Plan or make itself a proponent thereof in all respects, the Plan would not and could not be confirmed; that the necessary vote could not be obtained. Thereupon, the turning point occurred when, at the continued insistance of counsel for the Debtor, Howell finally presented a formal letter agreeing to fund the Plan.

At this juncture it appeared that Howell had not elected to cause Warrior to reject or assume its existing executory contracts. A strict interpretation of the Code indicated that such rejections or assumptions were required *before* a plan could be confirmed. Counsel for the Debtor prepared a draft of an order approving the confirmation of the Plan upon condition that such executory contracts be assumed or rejected within 30 days after confirmation. The Court was

persuaded that the proposed order, though innovative, was appropriate in the particular circumstances of this case. There immediately followed objections to the ability of Howell to perform its undertakings. Counsel for the Debtor responded by presenting testimony in behalf of Howell, satisfying the Court of its ability to do so. The Plan was then confirmed. Howell waived all unfulfilled conditions in its offer, paid the stockholders $1.78 per share and on December 5, 1980, payments were commenced to its unsecured creditors of all claims filed and allowed, including interest where granted.

## II.

### CONTENTIONS OF HOWELL PETROLEUM CORPORATION

During this hearing Howell stipulated that the hourly rates charged by Applicants for routine services to their general clients were reasonable and also conceded that the hours devoted to the case were necessary. Howell insisted that Applicants are due to be compensated only at their hourly rate for several reasons, namely:

1. Howell contends that the services performed by counsel for the Debtor were of a routine nature. The Court does not agree. On the contrary, the services performed were of an extraordinary nature, involving novel and untested questions under the new Bankruptcy Code. The Applicants were constantly under extreme pressure to meet deadlines set by the Court, to resist foreclosure and other action demanded by the Bank, to confer with Debtor's Directors and officers, to meet with various creditors, to file pleadings and motions, to confer with other counsel of the Debtor and creditors, to meet with investment bankers and to attend to other matters of significance throughout the proceedings.

2. Howell points out that the Applicants did not "produce" or "find" Howell, the purchaser. Judge Moller in his own testimony on behalf of Howell, conceded that "lawyers are not finders." The Court finds that the result obtained in this case was in

large measure due to the successful efforts of Applicants to maintain the Company as a viable and going concern and has taken this fact into account in determining reasonable compensation.

3. Howell further contends that the Applicants were committed to an agreement of employment by the Debtor at their hourly rates and that the Court should restrict compensation thereto.

■ The Court holds that any agreement the Applicants may have reached with representatives of Warrior prior to the filing of the Chapter 11 petition (or shortly after the petition was filed) was subsequently modified by the order of the Court entered on May 2, 1980, appointing Applicants as attorneys for the Debtor. The order specified that the appointment of the attorneys for Debtor was approved, as requested by Warrior, under a "general retainer"—not upon an hourly basis. The Court would not have permitted any agreement between Debtor and Applicants fixing the amount of attorneys' fees; and when the Court approved such fees on "a general retainer" basis, this meant, insofar as this Court is concerned, that all fees would be fixed by the Court and not by the Debtor and the Applicants.

■ Moreover, had this Court initially approved an agreement between the Debtor and Applicants for maximum compensation at Applicants' customary hourly rates, it would nevertheless be empowered to increase the agreed upon compensation under the provisions of § 328(a) of the Bankruptcy Code:

"(a) The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments unanticipatable at the time of the fixing of such terms and conditions."

The parties did not and could not have foreseen in April 1980 the time, the pressures, or the complexity of this case or the phenomenal results achieved. Any agreement entered into at that time for maximum compensation at hourly rates would have, therefore, proven "improvident" within the meaning of § 328(a).

This Court has been exercising an independent judgment in the determination and allowance of attorneys fees for more than forty years. The determination of a "reasonable fee" has been probably at times the most difficult and unpleasant task the Court has had, for rarely has it been the Court's ability to allow what was requested. More often lawyers have gone away deeply disappointed. Having lived with the Borah Act and mindful of its admonitions and the whole scheme of economy and frugality in paying lawyers as asserted by many decisions, the Court has lived in isolation and assumed the burden and responsibility of determining a reasonable fee in all bankruptcy matters.

The Court expects attorneys practicing in this District to devote whatever time is demanded, to respond to the needs of the client, to be willing to give of time and talent, and to leave to the Court the determination of fair and reasonable compensation. Section 330 of the Bankruptcy Code strongly supports this position and the duty of the Court to award reasonable compensation.

The crisis in this case occurred in October and November of 1980, when the creditors realized that Howell had purchased a majority of the stock and the principal and prime mortgage debt of some $32,000,000 and thus had effective control of the case. The creditors felt that they were in the middle and in for a squeeze from the top to the bottom and objected strenuously to accepting a Plan under which they had no

assurance of payment. Howell had set such deadlines that the creditors were in a "take it or leave it position" and left the door open for Howell to back out on its offer and force liquidation with Howell on command. In this way this case was unique. Although Howell appeared to be benevolent, it was in position to become extremely malevolent from the creditors' viewpoint, and this they resented bitterly.

It was at this point that the Debtor's attorneys were able to convince Howell that Warrior was still in the saddle and that Howell could in no way proceed to acquire the assets under a Plan on its timetable and tax program without a binding commitment to fund payment of creditors, producers, leaseholders, and other contracting parties.

The Applicants performed a successful balancing act by convincing Howell that the time for their purchase of Warrior had arrived and could not be put off. The result is now history, and although the Court yet has many issues to decide, the case moved into a smooth confirmation.

Howell now contests the fees requested, and no wonder, since it is in the position of a purchaser seeking to buy as low as possible. It feels that such concern on the part of creditors was unwarranted since it felt morally bound to pay and would do so without the necessity of binding itself legally.

The question raised is whether anything unusual or out of the ordinary occurred in the Case by which *attorneys* could claim a premium on success in holding the Case together when a breakdown was not only possible but imminent.

The Court feels that this case warrants a premium for ability, expertise and firmness of action under fire in a crisis, and has determined it has the authority to go beyond the mere matter of hours and reward success, considering the size of the estate.

### III.

### CONSIDERATION OF JOHNSON CRITERIA

The Fifth Circuit has held that "hours claimed or spent on a case should not be the sole basis for determination of a fee", but requires that trial courts consider twelve separate factors in evaluating requests for attorney's fees, *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), and this requirement has been held applicable to awards under the former Bankruptcy Act. *E. g. Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088 (5th Cir. 1980). The new Bankruptcy Code § 330(a)(1) requires that this Court determine:

> reasonable compensation for actual, necessary services ... based on the *time*, the *nature*, the *extent*, and the *value* of such services, and the *cost of comparable services* other than in a case under this title.... [emphasis supplied]

Because these criteria found in § 330 are in no way incompatible with the *Johnson* factors, this Court has separately considered each of the twelve *Johnson* factors, and finds, based on its review of the Application and testimony, its knowledge of the difficulty and complexity of this case, and its observation of the skill of Applicants, that the compensation in the amount of $415,000 is fair and reasonable and due to be awarded.

(1) *The time and labor required.* Time records submitted in support of this Application outline services performed by Applicants' firms for 2,012.1 hours through the end of February 1981. Applicants testified that these records were accurate but incomplete and that unrecorded time amounted to an additional 15%–20% of the time recorded through December 15, 1980, or approximately 275 to 365 hours. The Court has carefully reviewed these time records and finds no unnecessary duplication and no unwarranted time expenditures. In light of the adversary nature of the proceedings related to their fee application, the Court finds specifically that the time spent on the preparation of such applications, the Bank's appeal from Warrior's first interim award, and the preparation for court hearings was justified and is due to be fully compensated under the holding of *Rose Pass Mines, Inc.*

*v. Howard,* 615 F.2d 1088 (5th Cir. 1980).[4] A breakdown of the recorded hours devoted by Applicants to this matter, along with their historic hourly rates customarily charged to clients in other matters, is provided on the attached Appendix A to this Memorandum of Opinion.

(2) *The novelty and difficulty of the questions.* The *Johnson* court found that an attorney "should be appropriately compensated for accepting the challenge" of cases of first impression. This Court has found that the instant proceedings presented novel and difficult problems and issues of law under the new Bankruptcy Code. Accordingly, this factor may be taken into account in determining whether to award fees in excess of hourly rates.

(3) *The skill requisite to perform the legal services properly.* Based on its past experience and observation of proceedings in this case, the Court finds that Applicants exhibited an unusually high degree of skill in advocacy, which skill was essential to this successful outcome. This degree of skill is not fully reflected in the hourly rates charged by Applicants for routine services performed for general clients in other matters, and is therefore due to be considered in enhancing the fee award.

(4) *The preclusion of other employment by the attorney due to acceptance of this case.* Due to the time requirements of representing the debtor-in-possession in these proceedings, Applicants were necessarily precluded from devoting time to other clients, who pay for services rendered on a no-risk, current basis. Because delays and lack of personal attention to regular clients may jeopardize an attorney's professional relationships with those clients, these attorneys are due to be compensated for necessary, but exclusive devotion to this matter.

(5) *The customary fee.* The hourly rates customarily received by Applicants in other matters by clients paying on a regular, non-

contingent basis are set out on Appendix A to this Memorandum of Opinion. These rates do not reflect any enhancement for the successful result achieved here.

(6) *Whether the fee is fixed or contingent.* Fees for attorneys for trustees or debtors-in-possession are necessarily contingent to some degree. In a case of little or no assets, little or no compensation can be paid no matter the time devoted. Counsel in this case, as in other bankruptcy cases, had no assurance of what their compensation would be or what assets would be available for expenses of administration. This "contingency" factor should, therefore, be taken into account here.

The Bank's position in these proceedings was to the effect that Applicants should receive no compensation. It argued that administrative expenses could not be paid until secured creditors were satisfied, and further argued that the assets of the Debtor were insufficient to assure payment of the Bank debt in full. While the Court does not consider the possibility of no compensation to Applicants to have been realistic in this case, there was a strong possibility throughout the proceedings that Applicants might have been paid considerably less than their customary hourly rates, due to the lack of funds available in an unsuccessful reorganization.

In a highly successful case, attorneys are due to be compensated for this risk—incurred for the benefit of the estate—that their services might not be compensated at the rate available to them for doing precluded, non-contingent work for other clients. In the present case, this factor justifies an increase above the hourly rates set forth in Appendix A.

(7) *Time limitations imposed by the client or the circumstances.* The *Johnson* case held that priority work is entitled to some premium. This factor is to a great extent related to the "preclusion" factor, since pri-

---

4. The Court does take notice and into account that, for the time extended in preparation and prosecution of their application and its briefing, Applicants are entitled only to their customary hourly charges. The Court differentiates this from the time devoted by Applicants in resisting the Bank's position with respect to administration costs, as described above, because of the importance of the novel issue raised.

850

ority work requires the postponement or preclusion of other legal work.

In the present case, virtually all work performed by Applicants was emergency or priority work. Deadlines were, of necessity, set by the Court on a shortened time schedule, and Court appearances were required nearly every week to respond to adversary proceedings or to request relief on behalf of the Debtor. Problems in preserving Warrior as a going concern required daily attention and solutions. The priority and emergency nature of these services often required evening and weekend work. In a successful case such as the present one, such diligence is deserving of some premium.

(8) *The amount involved and the results obtained.* In determining the reasonable compensation for Applicants in these proceedings, the Court has considered most strongly the size of the estate and the extraordinarily successful results obtained. While the savings to the estate cannot be accurately measured, this Court has found that Applicants played a crucial role in, *inter alia,* preserving the going-concern value of the assets and preventing the appointment of a trustee, whose fees could have far exceeded those requested by Applicants.

In the instant case, payments to unsecured creditors and equity security holders alone as a résult of this reorganization total approximately $8,000,000, and may increase by an additional $1.7 million payment to stockholders, subject to undisclosed liabilities. The requested fee represents less than 6% of that which was paid to unsecured creditors and equity security holders, but at no cost to them, and less than 1% of the total assets and payments made to creditors and other interests.

Though these sums do not constitute "recovery" in the usual and ordinary sense, they are, in the opinion of the Court, essentially equivalent thereto because, had the automatic stay been lifted and a foreclosure resulted, the result to unsecured creditors and stockholders obtained would have been greatly diminished or lost altogether.

(9) *The experience, reputation and ability of the attorneys.* The Court has already alluded to the experience, reputation and ability of Applicants and the special skills and expertise required and demonstrated in this case.

(10) *The "undesirability" of this case.* The Court has seen no evidence that representation of Warrior was "undesirable" in the sense suggested by the *Johnson* court.

(11) *The nature and length of the professional relationship with the client.* Warrior was not a client of either Applicant firm prior to April 1980 and could not be expected to provide more than temporary business. This Court does not, however, consider this factor alone to require enhancement above customary hourly rates.

(12) *Awards in similar cases.* The final factor to be considered under the *Johnson* ruling is "awards made in similar litigation within and without the court's circuit." 488 F.2d at 719. In light of the language of Bankruptcy Code § 330 and the legislative history of that section, comparisons of awards under § 330 with those made prior to the enactment of the Code are of limited usefulness, and consideration must be made to awards in cases in other fields, with similar complexity, size and benefits.

One of the primary aims in awards under the prior Act was that of "economy," which was often held to require awards significantly lower than a practitioner's hourly rate in non-bankruptcy matters. *E. g. Massachusetts Mutual Life Insurance Co. v. Brock,* 405 F.2d 429 (5th Cir. 1968). In enacting § 330 of the Bankruptcy Code, the Congress corrected this inequity and shortsightedness by requiring that "the cost of comparable services other than in a case under this title" be considered in fixing an award. *Massachusetts Mutual, supra,* was specifically overruled on the basis that "Notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code." 124 Cong.Rec.H 11,091–2 (Sept. 28, 1978); S 17,408 (Oct. 6, 1978). *See also, Rose Pass Mines, Inc. v. Howard,* 615 F.2d 1088, 1092 n. 10 (5th Cir. 1980).

Even under pre-Code law, courts have expressly allowed fees in excess of customary hourly rates based on excellent quality and results. *E. g. Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088 (5th Cir. 1980) (allowing enhancement of 16% above hourly rate of partner for quality), *citing Wolf v. Frank*, 555 F.2d 1213, 1218 (5th Cir. 1977) (allowing enhancement of 33% based on "substantial recovery . . .—money which might well have been lost but for their efforts."); *In re Yuba Consolidate Industries, Inc.*, 260 F.Supp. 930 (N.D.Cal.1966).

In securities and antitrust litigation, where the contingency factor is a stronger consideration but which require no greater skill than have the instant proceedings, attorneys have frequently been awarded far in excess of two times their customary hourly rates. *E. g. Jorstad v. IDS Realty Trust*, 489 F.Supp. 1180 (1979–80 Transfer Binder) CCH Fed.Sec.L.Rep. ¶ 97,343 (D.Minn.1980) (Award of $2,597,167.75 represented more than 3.3 times hourly rates); *Arenson v. Board of Trade of City of Chicago*, 372 F.Supp. 1349 (N.D.Ill.1974) (Award of $1,339,060 represented four times hourly rates). Awards have as frequently resulted in average hourly compensation to partners and associates in excess of $200. *E. g. Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597 (D.Colo.1974) ($314 per hour); *Jorstad, supra* ($405 per hour); *Arenson, supra* ($358.56 per hour). In *Burgess v. Burgess*, 54 Ala.App. 396, 309 So.2d 107 *aff'd*, 293 Ala. 748, 309 So.2d 111 (1975), a Birmingham attorney was awarded $30,000 for 100 hours of services in a divorce proceeding.

## IV.

### CONCLUSION

In summary, this Court determines that all time reported by Applicants represented actual, necessary services and that the customary hourly rates charged by Applicants do not fully or fairly compensate Applicants for the risks incurred, the novelty and difficulty of questions presented, the experience, reputation, ability and skill required and exhibited in these proceedings, the preclusion or delay of other work, or the results obtained. Based upon the findings of fact and conclusions of law hereinabove set forth, the Court is, therefore, of the opinion that reasonable compensation to Applicants in this case is the sum of $415,000. Of that amount, the sum of $150,000 has previously been awarded to Applicants as interim compensation.

The Court has carefully reviewed all records reflecting expenses incurred by Applicants and determines that all such expenses were both actual and necessary and are due to be reimbursed under § 330(a)(2) in the amount of $12,485.07, less $11,603.95 heretofore awarded.

An order in conformity with the foregoing Memorandum of Opinion has been entered separately.

### APPENDIX A

| Attorney | Customary Hourly Rate | Recorded Time Devoted through February 28, 1981 | Hours Times Hourly Rate |
|---|---|---|---|
| Berkowitz, Lefkovits & Patrick | | | |
| Abe Berkowitz | $ 125.00 | 311.0 | $ 38,875.00 |
| | 130.00 | 412.0 | 53,560.00 |
| Arnold Lefkovits | 125.00 | 152.0 | 19,000.00 |
| | 130.00 | 69.4 | 8,879.00 |
| Michael L. Edwards | 85.00 | 5.5 | 467.50 |
| Susan Salonimer | 40.00 | 134.8 | 5,392.00 |
| | 55.00 | 98.0 | 5,390.00 |
| Gary S. Marx | 55.00 | 65.0 | 3,575.00 |
| Paralegals | 20.00 | 48.1 | 962.00 |

| Attorney | Customary Hourly Rate | Recorded Time Devoted through February 28, 1981 | Hours Times Hourly Rate |
|---|---|---|---|
| Silberman, Silberman & Loeb | | | |
| Wilbur G. Silberman | $ 100.00 | 615.0 | $ 61,500.00 |
| Robert H. Loeb | 100.00 | 31.3 | 3,130.00 |
| A. J. Beck | 75.00 | 61.0 | 4,575.00 |
| James G. Gann III | 40.00 | 8.0 | 320.00 |
| Stephen L. Johnson | 40.00 | 1.0 | 40.00 |
| TOTAL | | 2012.1 | $205,665.50 |