**In re SUMMIT COMMUNITIES OF FLORIDA, INC. d/b/a Park Summit, Debtor.**

**Bankruptcy No. 86–00213–BKC–SMW.**

United States Bankruptcy Court,
S.D. Florida.

April 12, 1988.

---

Jeffrey H. Beck, Gen. Counsel, Fort Lauderdale, Fla., for debtor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW PERTAINING TO ORDER AUTHORIZING AND AWARDING PAYMENT OF COMPENSATION TO PROFESSIONALS

SIDNEY M. WEAVER, Bankruptcy Judge.

THIS CAUSE having come before the Court for hearing on the applications for compensation of Jeffrey H. Beck, General Counsel for the Debtor (hereinafter referred to as "General Counsel"); Harvey Kopelowitz, Special Counsel for the Debtor (hereinafter referred to as "Special Counsel"); C. Daryl Hollis, Accountant for the Debtor (hereinafter referred to as "Accountant"); and Ray Ronk, Executive Director of the Debtor (hereinafter referred to as "Executive Director"), the Court having entered its Order dated January 25, 1988, authorizing and awarding the payment of fees and bonuses to the aforesaid individuals (hereinafter referred to collectively as "Applicants"), and Midlantic National Bank and Trust Company/Florida and Midlantic National Bank, the Co–Indenture Trustees under the Bond Issue which originally financed the Debtor's operations having requested that the Court enter findings of fact and conclusions of law, the Court does hereby, based upon the record of this case and related adversary proceedings as evidenced by the various Court files, the hearings held before this Court, and the uncontroverted presentations of the Applicants, enters the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

The within bankruptcy proceeding was initiated by the Debtor when it filed its voluntary Chapter 11 petition on January 28, 1986. Debtor's business consisted of the operation of an adult congregate living facility in Coral Springs, Florida, comprising 215 living units, a 35 bed nursing facility and other ancillary properties.

The project was financed by the issuance of $36 million in Broward County, Florida Housing Finance Authority bonds. Under the bond issue, a Trust Loan Agreement, a Trust Indenture, and Mortgage and Security Agreement was executed by the Debtor in favor of Midlantic National Bank and Trust Company/Florida and Midlantic National Bank as Co–Indenture Trustees (or their predecessors). Under these documents, the Indenture Trustees acted on behalf of the bondholders for the collection of sums due and the Indenture Trustees retained a security interest in virtually all of the property of the Debtor to secure repayment of the $36 million in bonds. At the time of the filing of the bankruptcy proceeding, the Debtor had been in default

of its obligations under the bonds since at least May 1, 1985.

At the time of the filing of the petition, the $36 million in bonds were held by several thousand bondholders whose identities and addresses were largely unknown inasmuch as the bonds were unregistered bonds. Under the Trust Indenture, the Indenture Trustees were limited in their discretion and ability to vigorously play a role in representing the interests of bondholders in the absence of a meeting of the bondholders and a vote by them as to actions to be undertaken.

The construction of the project had been completed prior to the filing of the bankruptcy proceeding. However, the Debtor did not complete payment in full of its construction obligations. Construction of the real property improvements on the premises were completed by a general contractor, Sollitt Construction Co., Inc. Sollitt had engaged numerous sub-contractors and materialmen. Substantial numbers of these were unpaid. Prior to bankruptcy, the Debtor had engaged in a marketing program pursuant to which a number of individuals entered into Residency Agreements to enter into occupancy in the project. Pursuant to these Residency Agreements, the individuals were required to pay a very substantial entrance fee to the Debtor in conjunction with their occupancy and to agree to periodic monthly payments for continued residency and services.

The Debtor was indebted to the Broward County Revenue Collector for taxes for the year 1985 at the time of the filing of the petition. It appears that the Debtor was not indebted to any other taxing authorities.

At the time of the filing of the petition, the Debtor, in addition to its real property holdings, had an interest in certain funds and accounts, including Debt Service Reserve Fund, General Interest Bond Fund, Construction Fund, Entrance Fee Fund, Special Entrance Fee Funds, and an Operating Account Fund. During the course of the proceeding, the Debtor maintained a Debtor-in-Possession Operating Account as well as a Debtor-in-Possession Payroll Account. The Indenture Trustees retained possession of these accounts and funds (with the exception of the Debtor-in-Possession Operating and Payroll Accounts), and retained a security interest in them.

At the time of the filing of the petition, the Debtor was experiencing an operating deficit of $110,000 per month. This deficit was being funded out of cash which would otherwise have inured to the benefit of the bondholders.

Prior to the filing of the proceeding, the Debtor had engaged in an extensive marketing campaign for the purpose of attempting to sell the project in full or partial satisfaction of its obligations. The result of these efforts was an agreement with Forum Florida Health Care, Inc., (hereinafter referred to as "Forum"). The pre-petition contract with Forum provided for a purchase price of $13,360,000.00, a bonus in the amount of $150,000.00 if a certain time frame could be achieved for approval of the contract and closing, and numerous provisions requiring that the Debtor pay real estate brokerage fees, that the Debtor provide certain warranties, and that there be certain potential offsets to the purchase price.

With the foregoing set of facts, this case had all of the potential to become one of the more complicated, lengthy, expensive and controversial proceedings in this Court's experience. The funds of the Debtor, or in which the Debtor had an interest would undoubtedly become subject to a major controversy amongst the following, all of whom would have laid claim to some or all of them: the 30 or more elderly residents of the facility who had made Entrance Fee payments prior to bankruptcy; Sollitt Construction Co., Inc., the general contractor who had completed construction of the project; some two dozen sub-contractors or materialmen who had participated in construction of the project; the Indenture Trustees who held a security interest on behalf of thousands of bondholders.

There would also have been controversy concerning the validity, priority and

amount of liens on the real property of the Debtor, including the following: the Indenture Trustees, who held the mortgage on the premises for the benefit of thousands of bondholders; Sollitt Construction, the general contractor who remained unpaid and who had filed suit, sub-contractors and materialmen who remained unpaid and who had filed mechanic's lien claims; the residents who had Residency Agreements. These residents would have naturally sought to establish continued rights to possession as they expressed opposition to having to move from their apartments.

A threshold question would arise as to how to manage the representation of the thousands of bondholders. In fact, it would have been difficult to ascertain how to properly advise and give notice to these bondholders of the pendency of the proceedings. Similarly, the Court could have been faced with dozens of elderly residents each taking a position in the proceedings.

The efforts to properly evaluate the potential for selling the premises could have been protracted and costly. The Debtor and the applicants could have simply moved for approval of the existing Forum contract with no effort to improve upon same. Alternatively, with or without rejecting this contract, the Debtor could have engaged a real estate broker or auctioneer and attempted to market the property with the concommitent expense and time involved in this. Indeed, the Bondholders' Committee appointed in the proceedings requested that the Court authorize the employment of a real estate broker for the Debtor and a commission of a minimum of $100,000.00. The Court rejected this request.

It must also be taken into account that this facility was an adult congregate living facility with a nursing facility located therein. Under the exigencies and stress of a bankruptcy proceeding, the regulatory atmosphere involving such sensitive facilities could very easily have been a problem for the Debtor, and therefore, a problem in terms of being able to maintain licensing, and transfer of licensing to effectuate a sale.

In the area of financial control and accountability, there could very easily have been a number of controversies involving the Debtor's application of funds prior to bankruptcy, the maintenance of its accounts and application of funds after bankruptcy, and the proper source of information for this. In view of what were to be questions concerning the funds and property of the Debtor, there might have even been some question as to whether professionals would have been available to perform services for the Debtor commensurate with what was very sophisticated set of financial requirements.

Finally, while a Reserve Fund of $100,000 was set aside for General and Special Counsel for the Debtor, the amount of said fund could very easily have been inadequate to meet the requirements involved in what could have been such a lengthy and controversial proceeding. Indeed, all of the foregoing factors must be considered in light of the $110,000 operating deficit that was occurring on a monthly basis.

Despite the foregoing potential recognized by the Court for this proceeding to be lengthy, complicated, controversial and expensive, the Court notes that the essential elements of the resolution of this case occurred swiftly, without controversy, with an absolute minimum of expense, and with a careful and sensible crafting of solutions. What was indeed a major and important case was essentially resolved through the efforts of the Applicants with a minimum of Court involvement and in a minimum time frame.

The results, on the other hand were, of maximum benefit to all of the creditors and claimants. The Court makes specific note of the fact that these results were achieved in part, as well, based upon the cooperative and extremely capable efforts of the other professionals representing interested parties in these proceedings. In fact, it would appear that this case represents a model of the results that can be obtained through capable efforts combined with cooperation. Nevertheless, however, Applicants' efforts were instrumental in the achievements in this case.

Applicants methodically and effectively tackled and over-came the problems outlined above and were able to effect a successful proceeding. The Court will briefly summarize their efforts and results.

In order to overcome the difficulty in dealing with thousands of bondholders and residents, a Residents Creditors' Committee and a Bondholders' Creditors Committee were swiftly approved by the Court. Publication of notices was authorized in various appropriate newspapers to advise bondholders of the existence of the proceeding and the appointment of a committee representing them.

In order to resolve the potential controversies concerning the funds and properties of the Debtor, an Adversary Proceeding was initiated to determine the validity priority and amount of liens and interests of fifty-seven parties in the real property of the estate and in the funds of the estate. A motion was filed and heard at the outset of the case for the use of cash collateral. A motion was filed to reject the 30 Residency Agreements as Executory Contracts and to determine the possessory rights, if any, which could be retained by residents notwithstanding such rejection. Every one of these matters was resolved by agreement of the parties and without the necessity of full adversary hearing, trial or appeal. The resolution of these matters is deemed by the Court to have been absolutely essential to enabling a sale of the property of the Debtor.

All controversies with the Regulatory Agencies were resolved without the need for Court introvention and without any delay. The transition from ownership of the facility by the Debtor to an ultimate purchaser was smooth and uninterrupted.

The Debtor remained accountable for all funds and reports and auditing of the Debtor's operations continued uninterruptedly and without controversy. Surprisingly, not one rule 2004 or 2005 examination was sought by any party in these proceedings. No controversies were brought before the Court for the turn over of records, documents, inspection of property or otherwise.

Immediately upon filing the Chapter 11 Petition, the Debtor moved for approval of the sale of the property to Forum or, significantly, to "such higher or better offer" as would be received by the time and date that the Court would approve the sale. Applicants did not engage a real estate broker or auctioneer. Rather, Applicants relied upon their own contacts as well as the publicity which had been generated concerning the project and its sale to generate interest on the part of potential purchasers. Contact was made with numerous prospective purchasers by Applicants.

Applicants' performance resulted in what was essentially an auction of the property. Forum was the successful purchaser at $18.1 million with Forum paying all real estate commissions and with few conditions and no set off provisions. This was an increase of $5 million net to the Debtor's Estate.

The sale was closed on June 16, 1986, and but for a determination which had to be made at the instance of bondholders and the Indenture Trustees concerning the specific method of distribution under the Trust Indenture, the Debtor had completed by such date its work in making funds available for distribution to all creditors. All of this had been accomplished in less than five months from the date of the filing of the petition. The results of the Applicants' efforts would have been found by this Court to be extraordinary and unique even in a case of normal complexity. Applicants' efforts and the results obtained are found to be particularly extraordinary and unique in the context of this case.

The resolution of controversies and the ultimate sale of the property provided a fund of approximately $20 million to be available for payments to bondholders, provided an 83% return of entrance fee funds to the residents of the facility, provided a mechanism for the residents to remain in the facility (which was one of their primary goals) provided a return of 100% to all sub-contractors and materialmen, and provided a payment for the benefit of the general contractor of a substantial amount.

These successful results were obtained in a time frame of only five months from the date of the filing of the petition. In the event that the controversies and matters had not been resolved in the extraordinary fashion accomplished by Applicants, the sale of the Debtor's premises might not have been able to have been consummated for a year or more. With the Debtor's deficit accruing at $110,000 per month, the Court concludes that Applicants performance resulted in savings to the Estate of $700,000 or more of such deficit expenses. The ability to proceed without an auctioneer saved the Estate an additional several hundred thousand dollars.

The Court will now review the specific role played by each of the applicants.

The Debtor's General Counsel performed the normal and essential functions of Debtor's counsel in a Chapter 11 proceeding, including the preparation of the Petition, Schedules, Statement of Affairs, complaints, applications, answers, proposed Orders, Findings of Fact and Conclusions of Law and Final Judgment in the proceedings which have been indicated above. These include: a Motion to Approve the Sale of Assets of the Debtor, a Motion for Assumption and Assignment of Executory Contracts, Emergency Motion for the Use of Cash Collateral, Motion for Approval of the Debtor's Rejection of Residency Agreements and Determination of Rights of Possession, Motion for Disbursement of Escrow Accounts, and Motion for Authority to File State Court Dissolution Proceedings. Additionally, counsel prepared the adversary proceeding concerning liens and interests in property and funds of the Debtor. These services provide ample justification for the hourly based compensation of sought by General Counsel.

The Court notes that General Counsel is an extremely able and competent bankruptcy counsel. As such, the Court notes that General Counsel is entitled to a substantial hourly rate for the services performed. However, the Court finds that in this particular proceeding, the services performed by General Counsel were exemplary, unique and above and beyond even those services which would be expected of counsel of his caliber.

General Counsel was the architect of the organization of the steps taken in this case. He also was the key person in the negotiated settlements of all controversies. Together with the other Applicants, General Counsel performed the services which made it unnecessary to employ an auctioneer or real estate broker. General Counsel personally and conducted the sale on April 9, 1986. This sale was conducted in such a fashion as to provide a simple, straight-forward and unconditional purchase obligation on the part of a purchaser for a net to the estate of $5 million more than had been the case at the beginning of the day. The Court finds that much of the credit for the extraordinary results obtained in this proceeding and the extraordinary speed with which those results were obtained is due to the services of General Counsel. Thus, General Counsel not only performed the usual and customary services for which he would be entitled to his customary compensation, but he also performed services which were extraordinary and unique and which achieved extraordinary and unique results.

Special Counsel for the Debtor also provided able and competent services to the Debtor with respect to the area of his authorization, including real estate, tax, corporate, regulatory and general non-bankruptcy matters. Special Counsel prepared for and attended various Board Meetings, State Court hearings, Residents Meetings, Ad Valorem Tax hearings, meetings with Creditor Committees; reviewed and prepared proposed contracts, settlement agreements, pleadings, letters to Board members, employment agreements, management agreements, auditing reports, applications for insurance; and participated in proceedings for the dissolution of the non-profit corporation after the liquidation of its assets. Special Counsel also participated in various real estate related activities, including title searches, survey and plat review, contract negotiations with purchasers, and closing arrangements concerning the ultimate closing of the sale of the Debtor's property. Special Counsel also

conducted extensive negotiations with Broward County Revenue Collector, State agencies regarding the regulation of this facility and the licensing of same, the Indenture Trustee, general contractor, and sub-contractors and materialmen.

Special Counsel also performed services of an extraordinary and unique nature. These included: negotiations with interested parties as to the sale of the Debtor's property; negotiations with and maintenance of relations with State agencies to enable the maintenance of the licensing of the facility, and transfer of the licensing to the purchaser, participation in negotiations leading up to successful resolutions of all of the controversies in the within proceeding and participation in the auction sale. Special Counsel was an essential and significant participant in the obtaining of the exemplary results obtained in this case.

The Accountant for the Debtor has performed normal and necessary accounting services for the Debtor during these proceedings. The accountant conducted regular audits of the Debtor's financial statements, prepared analyses of the schedules to be used in the proceeding and general ledgers of the Debtor's operations. Included in this was the preparation of Debtor's Cash Receipts and Cash Disbursements records and Trust statements, summarization of the appropriate general ledger accounts and preparation of the necessary journal entries. Cash disbursement journals were prepared for the various periods involved. The Accountant for the Debtor participated in the preparation of the bi-weekly reports submitted to the Court and tax returns for the Debtor's operations. Included in these activities were some special activities on the part of the accountant, including research analysis and documentation for conversion for the Debtor from a non-profit corporation to a private foundation, preparation of the Debtor's summary of construction activities for various periods essential in resolving disputes concerning construction of the facility; preparation of a December, 1985 State of Florida Insurance Department Report; development of Debtor's financial projections; and compilation of various facts and figures enabling prospective purchasers to ascertain the operation of the facility. These services are the normal and customary services which would have been anticipated of an accountant for the Debtor.

The Court finds, however, that the Accountant for the Debtor also performed certain extraordinary and unique services in the within proceeding, which, together with the efforts the other Applicants, resulted in the extremely favorable outcome. The Accountant provided business advisory services to the Debtor in conjunction with prospective purchase offers. Accountant for the Debtor rendered the accounting services and provided reports and information necessary to insure that all regulatory aspects of the operations would be in compliance and beyond reproach. The Accountant for the Debtor was also part of the team that negotiated with prospective purchasers prior to the date of the sale and participated in orchestrating and preparing strategy prior to, during and after the sale. These special and unique services provided by the Accountant and the extremely timely manner in which they were performed contributed to the ability of the Debtor to obtain the extremely favorable results that were obtained in this proceeding.

The Executive Director of the Debtor performed the usual and customary services of an operating director of such a facility and was compensated during the proceeding for these services. These services included the normal operations of the Debtor's facility, relations which the residents and other matters having to do with the day to day operations. The Executive Director, however, performed services above and beyond those usual and customary services which would be expected of a person in his capacity. The Court finds that the Executive Director performed specific services of great significance and benefit and of an extraordinary and unique nature in achieving the results in this proceeding, including: assisting in gathering information and in preparation of the petition, schedules, statement of affairs herein; the design and preparation of a sales package regarding the facility to be distributed to

major brokerage houses, real estate firms, accounting firms and banks; negotiations and discussions with potential purchasers and provision of documentation concerning the structural personnel, marketing and other aspects of the facility; and in effect, acting as the "on-site" sales agent for the purpose of inducing prospective purchasers to view this project favorably. The Executive Director also performed essential services in conjunction with the collections of funds due the debtor from various agencies of the State and further, provided an ability on the part of the Debtor to maintain its licensing and regulatory review without controversy. Finally, the Executive Director assisted in the transition with the ultimate purchaser, such that the turnover of control did not adversely effect the residents of the facility and was accomplished with a minimum of time and disruption.

In conclusion, the Court finds that at the out set of the case, the Debtor and the Court faced an extremely complex and potentially controversial and protracted set of problems. The Applicants' performance resulted in a case with virtually no controversy which was resolved within a short time frame with extraordinary results for all creditors and interested parties. The Court finds that the facts set forth in each of Applicants' application are true and correct that the time expended by each was reasonable and necessary. The Court finds that as a direct result of the efforts of the Applicants, the return to creditors in these proceedings was enhanced significantly, including a $5 million increase in sale proceeds from the sale of the Debtor's facility, including a savings of what would have amounted to several hundred thousands of dollars of either real estate or auctioneer's commissions, and including a savings of $700,000 or more in operating deficits which would have continued had the proceedings not been resolved expeditiously.

Against this backdrop, Applicants' request for compensation without any consideration of bonus requests constituted only slightly more than 1% of the total funds which would have been administered in the proceeding. Finally, Applicants' compensation was not assured at the outset of these proceedings. Special Counsel and General Counsel had a fund of $100,000 set aside for their compensation. Their compensation that was actually earned on an hourly basis could foreseeably, easily have well exceeded this sum in the aggregate and, in fact, did so. The Accountant for the Debtor had no deposit for the payment of his compensation. In large measure, therefore, the compensation for all Applicants was contingent in nature.

## CONCLUSIONS OF LAW

■ Based upon the foregoing findings of fact, and this Court's consideration of each of the twelve factors which govern the reasonableness of fees as enumerated in the matter of *First Colonial Corp. of America,* 544 F.2d 1291 (5th Cir.1977), this Court concludes that general counsel, special counsel and the accountant for the Debtor were each clearly entitled to receipt of their respective award of customary hourly based fees as set forth in the Order Authorizing and Awarding Payment of Fees. Further all parties present at the hearing on applications for compensation spoke in favor of such hourly awards. Accordingly, the Court will not elaborate on such compensation.

■ In concluding that Debtor's General Counsel, Special Counsel, Accountant and Executive Director were each entitled to an award of a bonus in addition to their award of fees, this Court considered several factors. This Court has concluded that the applicants requests for reasonable bonuses are justified for a number of reasons including their exceptional performance, the tremendous benefit conferred on creditors of the estate, the effective and successful nature of this proceeding and the time frame within which this was accomplished.

It is this Court's conclusion that in a proceeding such as this, where the nature of the underlying case is complex, where there are novel issues of law involved and where the applicants demonstrate a high degree of skill during the course of the proceeding, such applicants are entitled to receive a bonus. *See In re Warrior Drill-*

*ing and Engineering Company,* 9 B.R. 841, 7 B.C.D. 618 (N.D.Ala.1981). The magnitude of the exceptional results achieved and benefits conferred on the Debtor and the estate are directly attributable to the superior services rendered by the Applicants, and the Applicants therefore merit the award of a bonus.

This Court recognizes that bonuses are to be awarded sparingly and only under exceptional circumstances and concurs with the United States Supreme Court decision in *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In that case, which involved an appeal of a District Court Order awarding a bonus to plaintiff's attorney in a civil rights action, the Court held that Courts "... may justify an upward adjustment only in the rare case where the fee Applicant offers specific evidence to show that the quality of the service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was exceptional" (at 898–899). Though in that case the respondent was unable to meet its burden, here the Applicants have offered specific evidence demonstrating that the quality of service rendered were indeed superior and that those superior services were not reflected in the Applicants' normal billing rates.

In *In Re Elmendorf Board Corp.* 57 B.R. 580 (N.H.1986), the Bankruptcy Court repeatedly cited *Blum* in holding that by demonstrating the "ingenuity and creative effort" which underlay the successful negotiations with various parties, counsel's effort had been "truly exceptional" within the meaning of *Blum.* No less can be said with regard to the services rendered in this proceeding by the Applicants. The Applicants' "ingenuity and creative effort" is abundantly evidenced by the structuring of the final Asset Purchase Agreement, adroit resolution of the adversary proceeding, the large return to creditors, the skillful handling of the bondholders and residents as well as Applicants' overall approach to the ultimate resolution of various legal, financial, administrative and technical issues which confronted the Applicants during the course of this proceeding.

While the Court in *In Re White Motor Credit Corp.,* 50 B.R. 885 (N.D.Ohio 1985), recognized that exceptional circumstances are requisite before a Court may award a bonus, extraordinary efforts and remarkable results do constitute the exceptional circumstances necessary to justify the award of a bonus. The Court held that "in general, premiums are merited when there are circumstances and factors which warrant consideration in addition to those already employed in computing the Applicants lodestar or standard fee". *See also, In Re Idak Corp.,* 26 B.R. 793 (Mass.1982); *Matter of Aminex Corp.,* 15 B.R. 356 (S.D. N.Y.1981); *In Re: Wilson Foods Corp.,* 40 B.R. 118 (W.D.Okla.1984); and *Blum, supra.*

This Court concludes that the efforts put forth by Applicants were indeed extraordinary and are evidenced by the remarkable results achieved on behalf of the Debtor and its creditors. Again, those efforts and results are not wholly reflected by merely isolating and reviewing the number of hours expended by the Applicants nor by multiplying those hours by their customary hourly rate.

The court in *Idak Corp., supra,* held that "the amounts involved and the results obtained" constitute the primary justification for a premium payment. Employing these factors, this Court is left with the inexorable conclusion that the amounts involved (approximately 20 million dollars in distributions to creditors) and results obtained, as detailed above, justify a bonus award to the various Applicants.

While acknowledging that an adjustment to a fee award is the exception rather than the rule, the Court in *In Re Bolton Hall Nursing Home,* 40 B.R. 657 (Mass.1984), recognized that in reviewing the quality of representation, a bankruptcy court should "... consider the results of the attorneys participation in the bankruptcy proceeding and the benefit to the estate to see if circumstances warrant adjustment of the lodestar amount" (citing *In Re Casco Bay Lines, Inc.,* 25 B.R. 747 (1st Cir.1982). In *Bolton Hall,* the Court awarded a bonus of

approximately 50% over and above the allowed fee, justified primarily by the exceptional benefits realized by the estate, the payment of approximately 50 million dollars to various secured creditors, payment of millions of dollars to unsecured creditors and the overall successful nature of the reorganization.

This Court is convinced that the exceptionally successful outcome in this proceeding is primarily due to the efforts expended by debtors General Counsel, Special Counsel, Accountant and Executive Director. This Court has observed during the many hearings throughout this proceeding that the Applicants, and particularly the General and Special Counsel, maintained complete control and command over all negotiations and litigation involved herein. The sheer number of bondholders and defendants named in the adversary proceeding and various motions presented Debtor's General and Special Counsel with complex legal and logistical problems which were successfully overcome and resolved by those Applicants. Without their commitment and diligence, it is likely that the many forces involved, all pulling in different directions, could have ultimately resulted in disorganized, prolonged, and expensive proceedings which may have produced a far smaller distribution to all creditors.

The contingent nature of fees, risk of nonpayment and other risk factors have been held to be appropriate adjustment factors to be considered by a court in determining whether to award a bonus. *See, Furtado v. Bishop*, 635 F.2d 915 (1st Cir. 1980); *Kennelly v. Lemoi*, 529 F.Supp. 140 (R.I.1981); and *Bolton Hall, supra.* In *Blum, supra,* the concurring opinion of Justices Brennan and Marshall specifically supported the position that the risk of not recovering attorneys' fees is a proper basis on which to award a bonus or upward adjustment.

It is clear that had the debtor's assets not been so successfully liquidated and had the property involved been subjected to a foreclosure action, the Applicants bore the risk that they would not have been compensated for all of their time at their customary hourly rate.

It should also be noted that the total amount of compensation awarded to all Applicants in this proceeding based upon hourly factors constitutes slightly more than one percent of the approximately twenty million (20) dollars brought into the estate for distribution to creditors as a direct result of Applicants' services.

Four circuits, including this circuit, have held that the contingent nature of fees and the risk of nonpayment are factors which may justify an increase in an award of attorneys' fees in civil rights actions. See, *Jones v. Central Soya Company, Inc.*, 748 F.2d 586 (11th Cir.1984); and *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2nd Cir.1984). This Court recognizes that due to the uncertainties inherent in liquidation type reorganizations, it is highly conceivable that the Applicants would not have been fully compensated at their customary hourly rate. This substantial risk combined with the superior quality of services rendered by the Applicants and the highly successful nature of this proceeding, further reinforces this Court's belief that Applicants are entitled to be awarded a bonus herein.

It is widely accepted that when a benefit conferred on the estate is particularly great, the Court may award a bonus in addition to compensation at customary hourly rates. *See, Colliers on Bankruptcy*, § 330.05 (15th ed. 1987).

In *In Re Garland Corp.*, 8 B.R. 826 (Mass.1981), the Court awarded a 20% bonus as a "success factor" to an Applicant who had conferred a tangible benefit to the estate. Similarly, in *In Re Penn Dixie Industries, Inc.*, 18 B.R. 834 (S.D.N.Y. 1982), the Court awarded a bonus based upon the excellent results achieved by the Applicant. There the Court held that a bonus is authorized under the bankruptcy code as evidenced by the abandonment of the principal of "economy" contained in the previous Bankruptcy Act.

To illustrate and apply the "success factor" to this proceeding, one need only consider that prior to debtor's filing, after

months of exhaustive negotiations, the debtor had entered into an agreement to sell substantially all of its assets for $13,360,000. That pre-petition agreement also contained various holdback provisions, a provision obligating the debtor to pay a broker fee and other burdensome provisions. As a result of Applicants' efforts, the debtor was able to sell its assets for $18,100,000.00 and was a party to an agreement which contained no holdback provisions or other provisions burdensome to the debtor or the estate. This "extra" 5 million dollars brought into the estate for distribution to creditors was but one of many benefits conferred upon the debtor and the estate as a direct result of the Applicants' superior performance. Another tangible benefit bestowed on the estate arose out of General Counsel's ability to obtain the co-operation of the dozens of named defendants to the adversary proceeding. This enabled the parties to the principal adversary proceeding to submit to the Court agreed findings of fact, conclusions of law and final judgment. Initially it seemed likely that the adversary proceeding would be a protracted, complex and costly one with the outcome in substantial doubt. By skillfully eliciting the cooperation of the parties in resolving the complex legal issues involved therein, General Counsel was able to keep legal costs and fees at a minimum and thereby provide creditors with hundreds of thousands of dollars more than they may have received otherwise.

In reviewing the nature and complexity of the services rendered by the Applicants, the quality of services rendered, the exceedingly successful outcome of the proceeding and the risk factors of non-payment involved, this Court cannot avoid the inescapable conclusion that the award of the bonus to the Applicants is more than justified in this instance.

The Court concludes that a bonus totalling $75,000 is justified under the circumstances. Said sum represent only 1.5% of the increased sums ($5 million) realized from the success of the sale arranged and conducted by Applicants. Said sum represents a bonus equal to less than one third of total hourly compensation to be awarded to date and the proceeding is not yet concluded. This sum represents less than ½ of 1% of the total sums to be disbursed to creditors. Finally the bonus represents only a fraction of the savings in estate expenses resulting from either the lack of need for an auctioneer or real estate broker or from the savings realized from the expeditious resolution of all matters.

In considering the appropriate distribution of this bonus, the Court has considered the roles that each of the Applicants played in the case and the successful results. The Court concludes that the extraordinary results are attributable to Applicants in varying degrees. The performance of General Counsel was the most exemplary and instrumental in achieving the results obtained. As indicated he was essentially the architect of the structuring of the case and the key actor in effectuating the strategy. The role of Special Counsel was next in importance to the special results obtained followed by the Accountant and then the Executive Director.

Based upon these factors the Court would apportion the bonus as follows: $40,000 to General Counsel; $20,000 to Special Counsel; $10,000 to Accountant; and $5,000 to Executive Director. These bonuses are individually justified in each case. The total compensation awarded to date to applicants, including this bonus is as follows: $98,807.00 to General Counsel; $100,883.17 to Special Counsel; $92,000 to Accountant; and $5,000 to Executive Director (Executive Director was not previously subject to a determination of this Court for his usual compensation). Collectively, the total of this compensation represents only 1.5% of the approximately $20 million garnered in the proceeding. The compensation for each Applicant is fair and reasonable in light of the Findings of Fact set forth above and based upon cases set forth above. This case is one of those "rare" cases where exceptional performance and results deserve exceptional compensation.